IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA      :      CRIMINAL ACTION NO.
                           :
            v.                  :      NO. 1:13-CR-454-WSD-ECS
                           :
                           :
                           :
COLE JAMAL DANIELS,         :
                           :
     Defendant             :

**REPORT AND RECOMMENDATION
OF THE MAGISTRATE JUDGE**

**I.
Introduction**

This matter is before the Court on three motions to suppress evidence filed by Defendant, Cole Jamal Daniels. See [Docs. 23, 24, 28]. Defendant was initially arrested by Alpharetta police on October 3, 2013, for pimping, after a sixteen year old he had transported to a "date" with an undercover police officer was arrested at an extended stay hotel. He contends his warrantless arrest and the search of his person at a nearby Burger King were unconstitutional and that evidence and statements derived therefrom should be suppressed. [Doc. 24]. He also contends that the warrantless search, inventory, and impounding of a leased Chevrolet Malibu he had been driving that day were illegal. [Id.]. He further contends that statements he made on October 3 and 4, 2013, to federal agents at the police station after he was arrested were illegally obtained and should be suppressed. [Doc. 23]. Finally,

Defendant contends that evidence obtained from a warrantless search of his personal belongings that occurred on December 18, 2013, during his transfer from state to federal custody to appear on federal charges, should also be suppressed as unconstitutional under the Fourth Amendment. [Doc. 28].

The Court set the motions down for hearing on April 24, 2014, and the evidentiary hearing was completed on May 29, 2014. Evidence was taken on the motions and the parties filed briefs. A superceding indictment was returned on August 19, 2014, [Doc. 50], while the motions were being briefed. At a pretrial conference on September 15, 2014, the motions were deemed renewed and taken under advisement. [Doc. 59]. The matter is now ready for a report and recommendation to the district judge on the motions. This Report and Recommendation will address the motion to suppress evidence derived from his arrest and the vehicle seizure. [Doc. 24]. The other two motions, [Docs. 23, 28], will be addressed in a separate Report and Recommendation.

## II.
## Factual Background

**A. The Sting and Defendant's Arrest**

On October 3, 2013, the Alpharetta Police Department Special Investigation Unit was engaged in a prostitution sting operation. (T. 10-11) [Doc. 58 at 10-11].[1] Detective Parton with the police had

---

[1]     References to volume one of the transcript found at [Doc. 58] will be to the pagination of the Court reporter's transcript: (T. "page").

responded to a number of online advertisements for escort services and had set up dates with some of these advertisers. (T. 11). One of the dates was set up with a person named "Desire." Detective Parton set up a date with her for October 3 at an extended stay hotel room in Alpharetta for a price of $160. (T. 13). The room was monitored by the police.

"Desire" showed up at the room at around 4:30 p.m., (T. 37), and, after the money was produced, she got naked. (T. 14, 38). She looked to the officer to be very young. (T. 13, 15). After she stated that the officer could do "anything you want except I don't have anal sex," Detective Parton gave the signal and the take down officers came in and secured her. (T. 15-16, 38); (T. 118) [Doc. 43 at 9).[2]

Lieutenant Heath Holcomb was the supervising officer for the operation. (T . 115). He was involved in the arrest and the takedown of D.G. at the hotel and, later, Defendant Daniels. (Id.). He was in the next room monitoring the operation on video and audio. (T. 117). He was present as she was interviewed after she was detained. At that point the officers considered her a victim rather than an offender. (T. 17). She was asked her name, which she gave as "D.G.",[3] and her birthday, which she also provided. D.G. was then checked on

---

[2] Page references to volume two of the hearing, found at [Doc. 43], will also be made to the pagination for the full reporter's transcript, as opposed to the docket page: (T. "page").

[3] She will be referred to by her initials in this report, as she is in the indictment, for privacy reasons.

3

GCIC which showed her as a runaway from Virginia. (T. 16). She was 16. (T. 33, 119). They inquired about how she got to the hotel, and D.G. advised that someone had dropped her off. (T. 39, 119). She texted the person and he responded that he was at a Burger King nearby. (T. 17, 39, 120). The person she texted was listed as "Daddy" in her contacts and she identified him by name, Cole Daniels, and described him as a light-skinned black male. (T. 17, 120-21). She also described his clothing and the type of vehicle he was driving, a silver Chevy Malibu. (T. 17, 18). Detective Parton testifed that the term "Daddy" is commonly used by prostitutes to refer to their pimps. (T. 18, 121, 123). D.G. related that she lived with Daniels and that Daniels had helped her get from Virginia to Georgia. (T. 19).

The conversations with D.G. were being broadcast on a secure channel to other officers in the area. One of the officers working the area that afternoon/evening was Officer Dustin Andrew Bak. Officer Bak was a uniformed patrol officer driving a patrol car. (T. 78). He heard the broadcasts and then communicated directly with the sting officers through the secure channel for more information. (T. 79). He was able to locate a silver Malibu in the hotel parking lot, parked toward the end of the parking lot by the hotel, with the gas station and Burger King connecting to it. (T. 79). He ran the license and it came back as a rental car out of South Carolina. (T. 100).

4

Given a description and advised that the suspect might be at the Burger King, Officer Bak went to the Burger King. When he entered he saw a black male fitting the description of the suspect. He was the only patron in the establishment. (T. 80). Officer Bak started a conversation with him. He asked for identification, and Defendant produced an Oklahoma driver's license in the name of Cole Daniels. (T. 80). Officer Bak ran the license and it came back with a possible probation violation warrant. (T. 81). Officer Bak then detained him. (T. 89). He placed him in handcuffs, patted him down for weapons, and took his cell phone, keys, and wallet and laid them on the table near him. (T. 81). Officer Bak told him that he was just detained at that time while they were checking on the possible probation warrant to see if it was still current. (T. 82). Very shortly thereafter, within 30-45 seconds according to Officer Bak, the officers at the hotel advised him that Mr. Daniels' identification matched the name they were looking for. (T. 89-90, 97-98).

Within a very short time, maybe five minutes, Lieutenant Holcomb arrived at the Burger King, after he had been at the hotel with Detective Parton and D.G. (T. 82, 92, 122). Officer Bak testified that the Burger King was "literally within 50 to 75 yards of the hotel ... within a 30-second walk of the hotel." (T. 84). Lieutenant Holcomb told Officer Bak that Defendant was the individual they were looking for and directed him to place him under

5

arrest for pimping. (T. 82, 122-23).[4] Defendant was patted down a second time, and Officer Bak then put Defendant in his patrol car, along with his belongings, and took him to the police station. (T. 82-83, 99, 100). He left the keys to the Malibu with the vehicle. (T. 99). Officer Bak did not question Mr. Daniels, nor did he advise him of his rights, but Defendant remarked during the ride "that he didn't realize it was illegal to give a minor a ride." (T. 83).

## B.    The Vehicle Seizure and Inventory on October 3

Several hours after Defendant had been taken to the police department, after his duties on other cases at the hotel were completed, Detective Parton turned his attention to the silver Malibu that had been identified by D.G. as having been driven by Defendant to the hotel. (T. 20-21). In that regard, he testified that he called a wrecker to pick up the vehicle at 9:47 p.m. (T. 45). Around 10:00 p.m., he and another uniformed officer began to inventory the Malibu and to fill the inventory form out. (T. 44, 49). They were provided the keys by Lieutenant Holcomb. (T. 67). It was after dark and he used a flashlight to inventory the vehicle. (T. 25-26, 28, 49). He and the other officer prepared Government Exhibit 3, the vehicle impound inventory. The form was not signed by him, the officer who helped with the inventory, the wrecker driver, or the owner. (T. 49-50). The car was not illegally parked. (T. 53).

---

[4]    Officer Bak recalled at one point that he was told he was under arrest for prostitution of a minor, but he corrected that on re-direct. (T. 92, 102-03).

6

The City of Alpharetta has an impound policy. Gov't Ex. 1. He testified that he impounded the vehicle under the policy because Defendant had been arrested and the vehicle was in a pretty high crime area and they "didn't want the vehicle to be broken into or stolen." (T. 57). He also justified the seizure of the vehicle because it was connected to the crime. (Id.). They inventoried the entire car, (T. 58), writing down the items he perceived as having value. (T. 58, 66).

### III.
### Discussion

A. **Defendant's Detention and Arrest**

There are three broad categories of encounters between police and citizens for purposes of the Fourth Amendment. The first are police-citizen exchanges involving no coercion or detention. The second are brief seizures, or investigatory detentions, and the third are full-scale arrests. See United States v. Perez, 443 F.3d 772, 777 (11th Cir. 2006). The first type of encounter does not constitute a "seizure" sufficient to implicate the Fourth Amendment. Id. at 777-78. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002). "If a reasonable person would feel free to terminate the encounter, then he has not been seized." Id. at 201. "This test is objective and presupposes an

7

innocent person." United States v. Ramirez, 476 F.3d 1231, 1238 (11th Cir. 2007) (internal quotation omitted); see Florida v. Bostick, 501 U.S. 429, 438 (1991) ("[T]he 'reasonable person' test presupposes an innocent person.").

In this case Officer Bak approached Defendant in the Burger King and engaged him in conversation. This encounter soon escalated into an investigatory detention after Officer Bak asked for identification, ran the license, and was advised of a possible probation warrant. Up until the license came back with the possible warrant, the encounter could be characterized as consensual. But when the probation warrant turned up, Officer Bak detained Defendant by putting him in handcuffs and patting him down for weapons. (T. 89). He also seized Defendant's cell phone, keys, and wallet, and laid them on the table next to Defendant. Within a very short time, apparently a matter of seconds, the officers at the hotel also advised Officer Bak that Defendant was the man they were looking for and that he should be detained. (T. 98). At this point, Officer Bak clearly had reasonable suspicion, and, as discussed below, probable cause to detain Defendant, based upon the possible probation warrant and upon the evidence known by the officers at the hotel indicating that Defendant was D.G.'s pimp. All that is required for an investigatory stop is that the officers have reasonable articulable suspicion that the individual is engaged in criminal activity. Terry v. Ohio, 392 U.S. 1, 21, 28-31 (1968). Not only was there reasonable

8

suspicion, collectively the police had probable cause to detain him, as will be discussed below.

In this case, Officer Bak also patted Defendant down and seized his cell phone, keys, and wallet, after he detained him and put him in handcuffs. (T. 89). Under Terry, a police officer who makes an investigatory stop may conduct a limited pat-down, or frisk, of the suspect's outer clothing. 392 U.S. at 27, 30. But the frisk may be conducted only if the officer has a reasonable belief that the detainee poses a threat to the officer's safety or the safety of others. Id. at 28. The scope of a frisk must be limited to a search for weapons and may not be used to search for evidence of criminal activity. Id. at 29-30. In this case, there is no evidence that Officer Bak had a reasonable belief at the time he approached Defendant that Defendant posed a threat to his safety or the safety of others. So the seizure of the phone, keys, and wallet would be problematic if analyzed only as a pat-down for weapons under Terry.

An officer may, however, search the person of a suspect for weapons and evidence incident to arrest when placing him under formal custodial arrest. United States v. Robinson, 414 U.S. 218, 235 (1973); Arizona v. Gant, 556 U.S. 332, 338-39 (2009). But formal arrest must be based upon probable cause. Probable cause to conduct a warrantless arrest exists when the police have, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information and sufficient in itself to warrant a belief

9

by a prudent person that an offense has been or is being committed by the suspect. <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964).

In this case, Defendant was placed under formal arrest when Lieutenant Holcomb came into the Burger King a few minutes after Officer Bak had detained him, handcuffed him, and seized his phone, keys, and wallet. By that time, the officers clearly had probable cause to arrest Defendant for pimping under Georgia law.[5] Indeed, by the time Defendant was initially detained and cuffed by Officer Bak, the officers knew the following facts: D.G., who advised that she was sixteen years old, had been detained for prostitution after the sting operation with Detective Parton; D.G. had identified Cole Daniels as the person listed as "Daddy" in her phone contacts; D.G. had further identified Daniels as the person who had brought her to the extended stay hotel in a silver Malibu, dropped her off, and was waiting for her outside at the Burger King while she met her client at the hotel; D.G. had also told the officers that she lived with Defendant and that Defendant had helped her get to Atlanta from Virginia, where she had been a runaway. The information from D.G. was corroborated by the fact that a silver Malibu was indeed found

_____

[5]     O.C.G.A. § 16-6-11 provides, in part:
"Pimping.

A person commits the offense of pimping when he or she performs any of the following acts:
 ....
(3) Directs or transports another person to a place when he or she knows or should know that the direction or transportation is for the purpose of prostitution ...."

10

parked outside the hotel and an individual named Cole Daniels had been identified in the Burger King. These facts are sufficient to constitute probable cause for a prudent person to believe that the individual, Cole Daniels, who had been detained by Officer Bak at the Burger King, had committed the offense of pimping D.G. as defined in O.C.G.A § 16-6-11.

When Defendant was formally arrested, the officers were authorized to conduct a full search of his person for both weapons and evidence. Gant, 556 U.S. at 338-39; Robinson, 414 U.S. at 235. Furthermore, if probable cause to arrest existed *before* the search, then a search conducted immediately before formal arrest would be valid. Rawlings v. Kentucky, 448 U.S. 98, 111 (1980); United States v. Goddard, 312 F.3d 1360, 1364 (11th Cir. 2002). In this case, the facts that justified probable cause to formally arrest Defendant were known to the officers in the hotel contemporaneously with the detention of Defendant by Officer Bak and the seizure of his phone, keys, and wallet. (T. 89). It was not necessary that Officer Bak be apprised of all of the facts making up probable cause when he detained Defendant, patted him down, and seized the phone, wallet, and keys. "Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause." United States v. Allison, 953 F.2d 1346, 1350 (11th Cir. 1992) (citing United States v. Astling, 733 F.2d 1446, 1460 (11th Cir. 1984)); see also Terrell v. Smith, 668 F.3d 1244, 1252 (11th Cir. 2012) (collective knowledge of investigating

11

officers may be imputed to each participating officer).

As recited above, by the time Officer Bak detained Defendant, the officers, collectively, knew all the facts recited above in support of probable cause. There was probable cause, in other words, for Officer Bak to have arrested Defendant when he detained him, even if the formal arrest did not occur until Lieutenant Holcomb ordered Bak to take him into custody. The search and seizure of the items from Defendant's person by Officer Bak was therefore justified as incident to his arrest. As the Court reasoned in <u>Rawlings</u>, it was not particularly important that "the search preceded the arrest," where the police had probable cause to arrest the defendant before the search and "the formal arrest followed quickly on the heels of the challenged search." 448 U.S. at 111. In this case, probable cause existed, and the formal arrest followed within only a few minutes after the pat-down and seizure of the phone, keys, and wallet. Under these circumstances, I conclude that the arrest was valid, and the seizure of the phone, keys, and wallet were justified as a search incident to a valid arrest of Defendant. The motion to suppress, [Doc. 24], should therefore be **DENIED** insofar as it challenges Defendant's arrest and the search of his person incident to his arrest.[6]

---

[6] Although it appears clear that the wallet, keys, and cell phone would inevitably have been seized incident to Defendant's formal arrest, it is not necessary to fully discuss this basis for denying the motion. <u>See</u> <u>United States v. Rhind</u>, 289 F.3d 690, 694 (11th Cir. 1982)(evidence in bag would have inevitably been

12

AO 72A
(Rev.8/82)

**B.    The Vehicle Inventory and Seizure on October 3**

Defendant challenges the impound and inventory of the Chevrolet Malibu that had been driven by Mr. Daniels to the hotel to transport D.G to her appointment. Defendant argues that the police did not fully comply with the Alpharetta Police Department policy on impounding automobiles by, among other things, failing to list all the property in the automobile, and failing to sign the inventory and to have the wrecker driver also sign it. [Doc. 47 at 31–33]. He contends that the seizure and inventory were done for investigatory purposes and not to further the community caretaking function justifying such searches and seizures. Id. at 33–34. He also argues that impoundment was not warranted because Defendant had not been driving the vehicle when he was arrested. Id. at 35.

"The Fourth Amendment generally requires police to secure a warrant before conducting a search." Maryland v. Dyson, 527 U.S. 465, 466 (1999). But the Supreme Court has also held that inventory searches, conducted pursuant to an established procedure, but without a warrant, on legally impounded vehicles are valid under the Fourth Amendment. South Dakota v. Opperman, 428 U.S. 364, 372–73 (1976). In Colorado v. Bertine, the Supreme Court further explained that "[n]othing ... prohibits the exercise of police discretion [in deciding to impound a vehicle,] so long as that discretion is exercised according to standard criteria and on the basis of

───────────────

discovered in routine inventory search after Defendant's arrest).

13

something other than suspicion of evidence of criminal activity." 479 U.S. 367, 375 (1987). Even if an arrestee's vehicle is not impeding traffic or otherwise presenting a hazard, police officers may impound a vehicle, but the decision to impound a vehicle must be made in good faith, based upon standard criteria, and not solely based upon "suspicion of evidence of criminal activity." Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992). Additionally, if law enforcement officials have the authority to conduct a valid impoundment, they are not constitutionally required to permit an arrestee to make an alternative disposition of his vehicle. Id.

Furthermore, inventory searches, conducted in accordance with police policy administered in good faith, are also permissible. Bertine, 479 U.S. at 374. An inventory search permits a thorough search of property lawfully in police custody, as long as that search is consistent with the police caretaking function. United States v. O'Bryant, 775 F.2d 1528, 1534 (11th Cir. 1985). In this context, "the legitimacy of the search ... turns on its reasonableness in light of the community caretaking functions that allow inventory searches .... [T]he reasonableness of the inventory search depends on the particular facts and circumstances." United States v. Laing, 708 F.2d 1568, 1571 (11th Cir. 1983) (internal citation omitted). A warrantless inventory search of an automobile made "pursuant to standard police procedures" and for the purpose of "securing or protecting the car and its contents" is a reasonable police intrusion

14

that does not offend Fourth Amendment principles. Opperman, 428 U.S. at 372-73.

The Supreme Court has identified three distinct interests that justify the inventory search of an automobile: (1) protection of the owner's property while it remains in police custody; (2) protection of the police against claims or disputes over lost or stolen property; and (3) protection of the police from potential danger. Id. at 369. "An inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory." United States v. Khoury, 901 F.2d 948, 958 (11th Cir. 1990). "[T]he mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search." United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir. 1990) (quotation omitted). The government has the burden to show the requirements of an inventory search have been met. Sammons, 967 F.2d at 1543 (citation omitted).

In this case, the Alpharetta police were justified in impounding the Chevrolet Malibu, under its community caretaking function, after Defendant had been arrested. They were aware that the vehicle had been driven by Defendant to bring D.G. to the hotel. They had the keys as a result of the arrest of Defendant. Defendant had been taken to the jail and was no longer on the scene. Likewise, Defendant was not on the scene to present an alternative disposition for the vehicle because he had been arrested. Further, the vehicle was parked in what Detective Parton described as a high crime area where the car

15

would be left overnight if it was not impounded and they "didn't want the vehicle to be broken into or stolen." (T. 57). Under these circumstances the Alpharetta Department of Public Safety policy provided an established procedure for the impound. Specifically, the policy provided that such a vehicle could be impounded, if the driver of the vehicle has been arrested, when "(a) there is no one present who is authorized and capable of removing the vehicle." See Gov't Ex. 1. Although Detective Parton stated on cross examination that he was justified in impounding the car because he believed that it had been used in the commission of a crime, on direct he stated that he impounded it pursuant to the procedures in place in order to protect the vehicle from being broken into or stolen. (T. 57). I conclude that the decision to impound was "made in good faith, based upon standard criteria, and not solely based upon 'suspicion of evidence of criminal activity.'" United States v. Glover, 441 F. App'x 748, 751 (11th Cir. 2011) (quoting Sammons, 967 F.2d at 1543).

Although Defendant argues that the impound was for the impermissible purpose of searching it for evidence of crime, the circumstances of the inventory search that followed suggest otherwise. Detective Parton created an inventory with the help of another officer, after dark, with his flashlight, and then turned it over to the wrecker driver to take with him to the tow-lot. (T. 29, 49). He did not seize any property as evidence, and indeed, he did not conduct an excessively extensive search, as Defendant points out on cross and in his brief, having failed to list certain items that

16

were found during the later search. [Doc. 47 at 32]; (T. 58-59, 222-23); Def.'s Ex. 18. The search and seizure of evidence occurred later after the police obtained a search warrant. (T. 217-23); Def.'s Ex. 18. "The mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search." Roberson, 897 F.2d at 1096.

Defendant argues that the failure to fill out the inventory forms completely and to sign off on them and to list all the property in the car indicate that the inventory was a pretext. I decline to so find. Detective Parton and the other officer substantially complied with the impoundment procedures. They created an inventory and provided it to the wrecker driver as required by the policy. Although the inventory was a bit slipshod in its preparation, the inventory nevertheless identified the vehicle and listed most of the items of property that were in the car, even though it omitted miscellaneous paperwork that was later seized. Substantial compliance, as appears here, should be enough where it appears that the impounding was undertaken for appropriate reasons. See O'Bryant, 775 F.2d at 1534 (failure to compile a complete written inventory of the briefcase's contents or notify the owner that his briefcase had been recovered did not invalidate the inventory search).

In sum, I conclude that the seizure of the Malibu by impound without a warrant was valid under the Fourth Amendment. Furthermore, the inventory search conducted by Detective Parton on the evening of October 3 was in good faith, was substantially in compliance with the established procedures of the Alpharetta Police Department, and was

17

not solely based upon suspicion of criminal activity. Therefore, I **RECOMMEND** that the motion to suppress, [Doc. 24], be **DENIED** insofar as it pertains to the seizure of the vehicle by impoundment or its inventory by Detective Parton.[7]

## IV.
### Conclusion and Recommendation

In conformity with the discussion above, **IT IS RECOMMENDED** that the motion to suppress, [Doc. 24], be **DENIED**.

**SO REPORTED** and **RECOMMENDED**, this 23rd day of October, 2014.


*s/ E. Clayton Scofield III*
E. CLAYTON SCOFIELD
UNITED STATES MAGISTRATE JUDGE

---

[7]     Detective Parton did not seize any evidence in connection with the inventory, so there is no evidence to be suppressed arising from that search in any event.

AO 72A
(Rev.8/82)