IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
UNITED STATES OF AMERICA       :
                               :
         v.                    :        CRIMINAL ACTION
                               :
COLE LAMAR DANIELS             :        NO. 1:13-CR-454-WSD-ECS
                               :
         Defendant.            :
```

**REPORT AND RECOMMENDATION**
**OF THE MAGISTRATE JUDGE**

This matter is before the Court on two motions to suppress evidence filed by Defendant, Cole Lamar Daniels. See [Docs. 23, 28]. Defendant was initially arrested by Alpharetta police on October 3, 2013, for pimping, after a sixteen-year-old he had transported to a "date" with an undercover police officer was arrested at an extended stay hotel. He contends that statements he made on October 3 and 4, 2013, to federal agents at the police station after he was arrested were illegally obtained and should be suppressed. [Doc. 23]. Defendant also contends that evidence obtained from a warrantless search of his personal belongings that occurred on December 18, 2013, during his transfer from state to federal custody should also be suppressed as unconstitutional. [Doc. 28].

The Court set the motions down for hearing on April 24, 2014, and the evidentiary hearing was completed on May 29, 2014. Evidence was taken on the motions and the parties filed briefs. A superceding indictment was filed on August 19, 2014, [Doc. 50], while the motions were being briefed. At a pretrial conference on September

15, 2014, the motions were renewed and taken under advisement. [Doc. 59]. The matter is now ready for a report and recommendation to the district judge on the motions. For the reasons discussed in this report and recommendation, the motion to suppress statements, [Doc. 23], should be **DENIED**. The motion to suppress the evidence seized from Defendant's personal belongings by the federal agents before his initial appearance, [Doc. 28], should be **GRANTED**.

**I.**
**Factual Background**

**A.    The Sting and Defendant's Arrest**

On October 3, 2013, the Alpharetta Police Department Special Investigation Unit was engaged in a prostitution sting operation. (T. 10-11) [Doc. 58 at 10-11].[1] Detective William Parton with the police had responded to a number of online advertisements for escort services and had made dates with some of these advertisers. (T. 11). One of the dates was made with a person named "Desire." (Id.). Detective Parton set up a date with her for October 3 at an extended stay hotel room in Alpharetta for a price of $160. (T. 13). The room was monitored by the police. (T. 16).

"Desire" showed up at the room at around 4:30 p.m., (T. 37), and, after the money was produced, she got naked. (T. 14, 38). She looked to the officer to be very young. (T. 13, 15). After she

---

[1] References to volume one of the transcript found at [Doc. 58] will be to the pagination of the Court reporter's transcript: (T. "page").

stated that the officer could do "anything you want except I don't have anal sex," Detective Parton gave the signal and the take-down officers came in and secured her. (T. 15-16, 38); (T. 118) [Doc. 43 at 9).[2]

Lieutenant Heath Holcomb was the supervising officer for the operation. (T. 115). He was involved in the arrest and the take-down of "Desire" at the hotel and, later, the arrest of Defendant Daniels. (Id.). He was in the next room monitoring the operation on video and audio. (T. 117). He was also present as she was interviewed after she was detained. (T. 119). By that point in time the officers considered her a victim rather than an offender. (T. 17). She was asked her name, which she gave as "D.G.",[3] and her birthday, which she also provided. (T. 16). D.G. was then checked on GCIC which showed her as a runaway from Virginia. (Id.). She was sixteen. (T. 33, 119). They inquired about how she got to the hotel, and D.G. advised that someone had dropped her off. (T. 39, 119). She texted the person and he responded that he was at a Burger King nearby. (T. 17, 39, 120). The person she texted was listed as "Daddy" in her contacts in her phone and she identified him by name, Cole Daniels, and described him as a light-skinned black male. (T. 17, 120-21). She also described his clothing and the type of

---

[2] Page references to volume two of the hearing, found at [Doc. 43] will also be made to the pagination for the full reporter's transcript, as opposed to the docket page: (T. "page").

[3] She will be referred to by her initials in this report, as she is in the indictment, for privacy reasons.

3

vehicle he was driving, a silver Chevy Malibu. (T. 18). Detective Parton testified that the term "Daddy" is commonly used by prostitutes to refer to their pimps. (T. 18, 121, 123). D.G. related that she lived with Daniels and that Daniels had helped her get from Virginia to Georgia. (T. 19).

The conversations with D.G. were being broadcast on a secure channel to other officers in the area. (T. 19-20). One of the officers working the area that afternoon/evening was Officer Dustin Andrew Bak. (T. 77-78). Officer Bak was a uniformed patrol officer driving a patrol car. (T. 78). He heard the broadcasts and then communicated directly with the sting officers through the secure channel for more information. (T. 79). He was able to locate a silver Malibu in the hotel parking lot, parked toward the end of the parking lot by the hotel, with the gas station and Burger King connecting to it. (Id.). He ran the license and it came back as a rental car out of South Carolina. (T. 100).

Given a description and advised that the suspect might be at the Burger King, Officer Bak went to the Burger King. (T. 79-80). When he entered he saw a black male fitting the description of the suspect. (T. 80). Defendant was the only patron in the establishment. (Id.). Officer Bak started a conversation with him. (Id.). He asked for identification, and Defendant produced an Oklahoma driver's license in the name of Cole Daniels. (Id.). Officer Bak ran the license and it came back with a possible probation violation warrant. (T. 80-81). Officer Bak then detained

4

him. (T. 89). He placed Defendant in handcuffs, patted him down for weapons, and took his cell phone, keys, and wallet and laid them on the table near him. (T. 81). Officer Bak told him that he was being detained at that time while they were checking on the possible probation warrant to see if it was still current. (T. 82). Very shortly thereafter, within thirty to forty-five seconds according to Officer Bak, the officers at the hotel advised him that Mr. Daniels's identification matched the name they were looking for. (T. 89-90, 97-98).

Within a very short time thereafter, maybe five minutes, Lieutenant Holcomb arrived at the Burger King, after he had been at the hotel with Detective Parton and D.G. (T. 82, 92, 122). Officer Bak testified that the Burger King was "literally within 50 to 75 yards of the hotel . . . . within a 30-second walk of the hotel." (T. 84). Lieutenant Holcomb told Officer Bak that Defendant was the individual they were looking for and directed him to place him under arrest for pimping. (T. 82, 122-23).[4] Defendant was patted down a second time, and Officer Bak then put Defendant in his patrol car, along with his belongings, and took him to the police station. (T. 82-83, 99-100). He left the keys to the Malibu with the vehicle. (T. 99). Officer Bak did not question Defendant, nor did he advise him of his rights, but Defendant remarked during the ride "that he

---

[4] Officer Bak recalled at one point that Defendant was told he was under arrest for prostitution of a minor, but he corrected that on re-direct. (T. 92, 102-03).

didn't realize that it was illegal to give a minor a ride." (T. 83).

**B.     Statements made on October 3 and 4, 2013.**

Detective Laurie Nicholson of the Alpharetta Police Department was working with the FBI task force on juvenile prostitution and human trafficking on October 3 when Defendant was arrested. (T. 135-36). Lieutenant Holcomb contacted her about the arrest of the Defendant and the fact that D.G. was a minor. (T. 136). She and Special Agent Nathan Whiteman with the FBI interviewed Defendant at the jail. (T. 136-37). By the time of the interview, the agents had confirmed that D.G. was a runaway from Virginia and was sixteen years old. (T. 207). The interview started about 8:30 and lasted about an hour. (T. 143, 173). They had already interviewed D.G. (T. 158, 207). They were casually dressed and their guns were not visible, nor were their guns displayed during the interview. (T. 174). The interview was in a small conference-type room. (T. 137, 158, 173). Defendant was un-handcuffed when he came into the room. (T. 138, 174).

Defendant was read his rights and he signed the waiver form. (T. 138-39). See Gov't Exh. 4. He was advised of the state charges and was allowed to read the rights and waiver form. (T. 163-64, 175). He acknowledged that he understood his rights. (T. 177-78). He never asked for an attorney. (T. 139, 179). He was not threatened. (T. 138, 174). Agent Whiteman conducted the interview. (T. 139, 179). Before Agent Whiteman administered the <u>Miranda</u>

AO 72A
(Rev.8/82)

rights,[5] Defendant remarked, without being questioned or prompted, that he could not believe that D.G. was sixteen. (T. 161-62, 175, 209-10). They asked for consent to search Defendant's cell phone, which he declined to give. (T. 167-68, 180-81). They advised him that they could get a warrant for the phone. (T. 169). The interview lasted about an hour to an hour and a half. (T. 179). Detective Nicholson took custody of Defendant's cell phone and certain credit cards that were in his possession but not in his name. (T. 181-82). They also went through the contents of his wallet. (Id.); see also Gov't Exh. 9.

The next day, in the afternoon, Detective Nicholson went back to the jail and spoke with Defendant again. (T. 143, 146). By this time Defendant was housed in the Fulton County Jail on Rice Street in Atlanta. (T. 146-47). She advised him that D.G. was infected with a sexually transmitted disease, to which Defendant responded by admitting that he had had sex with her. (T. 141-42). He "became a little upset" when told of the health status of D.G. (T. 142, 150).

Before they sat down to talk, Detective Nicholson told Defendant that the rights that they "discussed the night before are still in effect," (T. 151-52), and "that he . . . did not have to talk to [her] if he didn't want to, and that he could tell [her] to leave at any time, and [she] would." (T. 141). She did not read him his Miranda warnings again. (T. 151-52). She asked him who the

---

[5] See Miranda v. Arizona, 684 U.S. 436, 444-45 (1966).

tablet belonged to and he told her. (T. 142, 155-56). They met in a storage area with a window that she spoke through to him. (T. 153). They were separated by the window. (Id.). The interview was fifteen to thirty minutes long. (T. 156).

**C.     Transfer to Federal Custody on December 18, 2013**

On December 18, 2013, after Defendant was indicted in federal court on the instant charges, Agent Whiteman, accompanied by Special Agent Joe Fonseca of the FBI, picked Defendant up and transported him from the Fulton County Jail to federal custody to be turned over to the United States Marshals so he could make his initial appearance on the federal charges. (T. 184, 190). This was approximately two and a half months after he was initially arrested. (Id.). When the agents took custody of Defendant at the jail, he had some personal property with him in a brown paper bag. (T. 184, 192-93). Agent Whiteman went through the property, inventoried it, and seized five pieces of paper as evidence that he believed, because of his investigation, contained a list of victims and potential witnesses in the case. (T. 184, 199-200, 202-03). The inventory was done at the offices of the United States Attorney in Atlanta prior to Defendant's first appearance before the Court on the indictment in this case. (T. 201). Agent Whiteman stated that he inventoried the property in conformity with FBI policy requiring such an inventory where they become possessed of property that the Defendant cannot take with him into custody. (T. 185); see also Gov't Exh. 7. The policy is contained in the Domestic Investigations and

8

Operations Guide ("DIOG"), section 19.7.3. (T. 187); see also Gov't Exh. 5.

Agent Whiteman also attempted unsuccessfully to turn over the property in the bag, except the five pieces of paper, to Defendant's attorney and ultimately returned the property, except for the five pieces of paper, to a family member, J.T. Summers. (T. 185-86); see also Gov't Exh. 7. The five pieces of paper were the only material seized and not turned over to Defendant's representative. (T. 191).

**III.**
**Discussion**

**A.   The October 3 and 4 Statements**

Defendant argues that the statements he gave to Agent Whiteman and Detective Nicholson on October 3 and 4 were involuntary. [Doc. 47 at 25]. He also argues that any statements Defendant made on October 4 must also be suppressed because Defendant was not re-administered his Miranda warnings when Detective Nicholson came to see him that morning.[6] [Id. at 25-28].

In general, the government must prove that the defendant

_____

[6] Defendant contends that the statements he made on October 3 and 4 were the fruits of his earlier unlawful frisk, search, and arrest and should be suppressed as violations of his Fourth Amendment rights. [Doc. 47 at 24]. However, in a prior Report and Recommendation, I have found that Defendant's frisk, search, and arrest did not violate his rights under the Fourth Amendment. [Doc. 60 at 12]. As a result, Defendant's statements at the police station would not have been tainted by any Fourth Amendment violation, as there was none, and this argument is without merit. For the same reason, Defendant's utterance to Officer Bak while on the way to the station that Defendant "didn't realize that it was illegal to give a minor a ride" was not tainted by any Fourth Amendment violation.

9

voluntarily, knowingly, and intelligently waived his or her Miranda rights. Miranda, 384 U.S. at 475. In this case, there is no dispute about the fact that Defendant was read his Miranda warnings and signed a written waiver on October 3. See Gov't Exh. 4; (T. 138-39, 163-64). Defendant acknowledged that he understood his rights. (T. 177-78). There is no evidence that the waiver of his Miranda rights was not knowing, intelligent, and voluntary. In fact, all the testimony about the circumstances of the waiver were to the contrary. See (T. 138-39, 164-66, 177-79). Accordingly, I find there is no issue about the effectiveness of the Miranda warnings or the validity of his waiver, at least as it pertains to statements made on October 3.

Regardless of whether Defendant was administered Miranda warnings and waived his rights, any statements he made must also have been made voluntarily. See Chavez v. Martinez, 538 U.S. 760, 769-70 (2003). The voluntariness of a statement must ultimately be assessed under the totality of the circumstances, considering such factors as the defendant's intelligence, the length of detention, the nature of the interrogation, and the use of any physical force against the defendant. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); see also United States v. Thompson, 422 F.3d 1285, 1295 (11th Cir. 2005) ("The district court must consider the totality of the circumstances in assessing whether police conduct was 'causally related' to the confession." (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992))); Miller v. Dugger,

10

838 F.2d 1530, 1536 (11th Cir. 1988) (same); <u>United States v. Estelan</u>, 156 F. App'x 185, 194 (11th Cir. 2005) (same). The inquiry focuses on whether the defendant's free will was overborne by any improper influence of law enforcement. <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986); <u>see also United States v. Gonzalez</u>, 71 F.3d 819, 828 (11th Cir. 1996) ("[T]he absence of official coercion is a *sine qua non* of effective consent . . . ."), <u>abrogated in part on other grounds by Arizona v. Gant</u>, 556 U.S. 332 (2009). "[A] confession induced by threats or promises is not voluntary." <u>United States. v. Vera</u>, 701 F.2d 1349, 1364 (11th Cir. 1983) (citing <u>Bram v. United States</u>, 168 U.S. 532, 542 (1897)).

There is no testimony or other evidence in this case to contradict the testimony of the agents that the interviews of Defendant were relatively relaxed; that they were not extended in duration; that no guns were brandished or displayed; that no threats, physical or otherwise, were made; and that there were no improper promises of leniency. In short, the statements were in no sense compelled. As the Court said in <u>Berkemer v. McCarty</u>, 468 U.S. 420, 433 n.20 (1984), "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of <u>Miranda</u> are rare." This is not one of those rare cases. I find no evidence to support a finding that Defendant's statements on October 3 and 4, 2013, were not voluntary.

The October 4 statements to Detective Nicholson, however, were

11

made without a repetition of the full Miranda warnings. Detective Nicholson went to the jail the morning after the interview of the night before to advise Defendant that the female victim in this case, D.G., had been infected with a sexually transmitted disease. She met with Defendant in an informal environment, in a converted interview/storage room at the jail with a window between them. (T. 153). The interview did not last but fifteen to thirty minutes. (T. 156). When they sat down to talk, she advised him that the rights that they had discussed the night before were still in effect, that "he did not have to talk to [her] if he didn't want to, and that he could tell [her] to leave at any time and [she] would." (T. 141, 151-52). She went on to question Defendant about a cell phone and a tablet device. (T. 155-56).

Defendant argues that any statements he made on October 4 were made in violation of Miranda as well as being the fruit of his unlawful arrest the day before. [Doc. 47 at 28].[7] The Miranda argument is based upon the proposition that Detective Nicholson did not re-administer the warnings and obtain another waiver and that this violated Defendant's Miranda rights, requiring suppression.

As Defendant acknowledges, "there is no requirement that an

---

[7] Insofar as the latter argument is concerned, I have recommended that the stop, frisk, and arrest on October 3 be upheld as valid under the Fourth Amendment. See [Doc. 60]. In the event this recommendation is adopted, then there could be no fruit of the poisonous tree derived from his arrest, as Defendant contends, so this argument for suppression would be without merit. See supra note 4.

12

accused be continually reminded of his rights once he has
intelligently waived them." Martin v. Wainwright, 770 F.2d 918, 930
(11th Cir. 1985) (quoting Biddy v. Diamond, 516 F.2d 118, 122 (5th
Cir. 1975)),[8] abrogated in part on other grounds by Davis v. United
States, 512 U.S. 452 (1994). In Martin, the Court held that, where
the defendant had been fully warned some seven days before and had
waived his rights, and where he had indicated on the second occasion
that he still understood his rights, further delineation of his
rights would have been needless repetition. Id. at 930-31. Likewise,
in Biddy, 770 F.2d at 122, the Court held that full re-advice of
Miranda rights was not required, where the defendant's rights had
been explained to her some twelve days before, and where she stated
that she remembered her rights as previously explained to her. In
Ballard v. Johnson, 821 F.2d 568, 572 (11th Cir. 1987), the Court
found that complete Miranda warnings were not required prior to a
subsequent interrogation that occurred on the same day, after a
break in questioning, as a result of his transfer from the police
station to the sheriff's department. There the defendant
acknowledged to the district attorney that he had been advised of
his rights earlier in the day. Id.

In Jarrell v. Balkom, 735 F.2d 1242, 1254 (11th Cir. 1984),
the defendant's confession given less than four hours after the

---

[8] Decisions of the Fifth Circuit rendered on or before
September 30, 1981 are binding precedent in the Eleventh Circuit.
Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en
banc).

13

issuance of Miranda warnings was not rendered inadmissible because of the failure to reissue the warnings. There the defendant confessed to an officer other than the one who initially interviewed and Mirandized him. Id. The Court pointed to the fact that the interviewing office asked the officer who had previously given the warnings, in the defendant's presence, whether the defendant had received his warnings. Id. The record did not reflect that the defendant expressly acknowledged receiving the warnings, however. Id. And, in a more recent case, statements made without repetition of the Miranda warnings were upheld even without an express acknowledgment that the defendant remembered his rights where other circumstances obviated the need for reiteration. See United States v. Barner, 572 F.3d 1239, 1245 (11th Cir. 2009). In particular, the Court noted the fact that the defendant initiated the interview and that it was conducted "under circumstances which suggested that the defendant was free to terminate the conversation." Id.

In this case, I find that the totality of the circumstances show that, on the morning of October 4, Defendant Daniels was aware of his rights, as they had been read to him just the night before; he had been given an opportunity to read them himself; and he had knowingly, intelligently, and voluntarily signed a waiver of his rights. Detective Nicholson reminded Defendant of the rights he had been advised of the night before and advised him that they were still in effect. (T. 141, 151-52). Detective Nicholson told Defendant that he did not have to talk to her if he did not want to

14

and that he could tell her to leave. (Id.). Furthermore, the circumstances in which they spoke to each other were such as to suggest that Defendant was free to terminate the conversation. Under these circumstances, I conclude that there was no violation of Defendant's rights arising from the failure of Detective Nicholson to re-administer Defendant's full Miranda rights and obtain another waiver.

Accordingly, based upon the above discussion I conclude that the motion to suppress statements made on October 3 and 4 to Agent Whiteman and Detective Nicholson should be **DENIED**.[9]

**B.   The Transfer from State to Federal Custody**

Defendant contends that Agent Whiteman violated his Fourth Amendment rights when he went through the bag of personal property that Defendant had brought with him from the Fulton County Jail when he was transferred to federal custody. [Doc. 47 at 29]. Agent Whiteman went through the bag at the federal building in the offices

---

[9] Defendant argues that the statement made by him to the agents on October 3 to the effect that he could not believe that D.G. was sixteen years old should be suppressed. [Doc. 47 at 24]. In order for a statement to have been obtained in violation of Miranda, it must have been made as a result of questioning by the police or the functional equivalent of questioning. Rhode Island v. Innis, 446 U.S. 291, 299-301 (1980). The facts do not show that this statement was made in response to any questioning by the agents or its functional equivalent. The motion should therefore be **DENIED** as to this statement. For the same reason, Defendant's unsolicited statement to Officer Bak "that he didn't realize that it was illegal to give a minor a ride," (T. 83), was not the product of questioning and should, likewise, not be suppressed. See Innis, 446 U.S. at 299-301.

of the United States Attorney just before Defendant was to make his initial appearance before a magistrate judge on the indictment. (T. 200-01). Agent Whiteman made an inventory of the property and, in the process, seized five pieces of paper that Agent Whiteman testified he recognized as being of evidentiary value in the case because of the information contained on the papers. (T. 184-85); see also Gov't Exh. 7. Defendant contends that the seizure was not justified as incident to arrest or as a valid pre-incarceration inventory, and should not have been made without a warrant. [Doc. 47 at 38-41].

The government responds that Agent Whiteman was authorized to conduct an inventory of Defendant's property as incident to his arrest and transfer into federal custody (prior to returning the property to Defendant's family or attorney) and that Agent Whiteman was entitled to seize the pieces of paper that he recognized as having evidentiary value in the case. [Doc. 49 at 36-38]. The government contends that FBI policy requires the agents to make such an inventory for the mutual benefit of the FBI and the arrestee. [Id. at 37].

Inventory searches of personal property are "a well-defined exception to the warrant requirement of the Fourth Amendment." Colorado v. Bertine, 479 U.S. 367, 371 (1987). "At the stationhouse, it is entirely proper for the police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests

16

supports an inventory process." <u>Illinois v. Lafayette</u>, 462 U.S. 640, 646 (1983). Specifically, "inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." <u>Bertine</u>, 479 U.S. at 372.

In <u>Bertine</u>, the Court also emphasized "the requirement that inventories be conducted according to standardized criteria." <u>Id.</u> at 374 n.6. The use of standardized procedures tends to "ensure that the intrusion [is] limited in scope to the extent necessary to carry out the caretaking function." <u>South Dakota v. Opperman</u>, 428 U.S. 364, 374-75 (1976); <u>see also</u> <u>Illinois v. Lafayette</u>, 462 U.S. 640, 646-49 (1983).

Likewise, an inventory search cannot be a "ruse for a general rummaging in order to discover incriminating evidence." <u>Florida v. Wells</u>, 495 U.S. 1, 4 (1990). And to ensure that an inventory search is not a surrogate for investigation, "the scope of the search may not exceed that necessary to accomplish the . . . inventory.'" <u>United States v. Bell</u>, No. 13-13002, 2014 WL 4977329, at *2 (11th Cir. Oct. 7, 2014) (quoting <u>United States v. Khoury</u>, 901 F.2d 948, 958 (11th Cir. 1990), <u>modified</u> <u>on</u> <u>other</u> <u>grounds</u>, 910 F.2d 713 (1990)) (brackets omitted). "On the other hand, a legitimate non-pretextual inventory search is not made unlawful simply because the investigating officer remains vigilant for evidence during his inventory search." <u>Khoury</u>, 901 F.2d at 959 (quoting <u>United States v. Orozco</u>, 715 F.2d 158, 161 (5th Cir. 1983)).

17

In this case, I conclude that Agent Whiteman conducted a valid inventory search of the brown bag containing Defendant's personal items. The search was warranted as an inventory search by the justifications for such inventory searches — the protection of the owner's property and to insure against claims of loss. Defendant was coming into the custody of the federal authorities for the first time, to be incarcerated and to make his appearance before the Court to plead to the indictment. Agent Whiteman was governed by standardized FBI procedures requiring that "personal property removed from a person who has been arrested and is to be incarcerated should be carefully inventoried and promptly, thoroughly searched by Agents prior to being stored for safekeeping." Gov't Exh. 5 at ¶ 19.7.3; see also (T. 187-88).

Defendant's argument that he had not "been arrested" as contemplated by the policy is without merit. Defendant had indeed been arrested on a federal warrant and taken into custody for the first time by the federal authorities on the new federal charges. The fact that he was already in the custody of the state on other charges does not render the justifications for an inventory of personal property now coming under the responsibility of the federal authorities inapplicable.

On the other hand, whether the examination and seizure of the five pieces of paper, see (T. 203), was justified as within the scope of a proper inventory search is a closer question. Agent Whiteman not only made an inventory of the property in the bag, he

18

examined the content of the pieces of paper sufficiently to determine that they contained names, nicknames, addresses, and telephone numbers of victims that matched up with what he knew through his investigation. (Id.). The evidentiary significance of these names and numbers could only be recognized by an agent familiar with the investigation who looked carefully at the names and numbers. His examination was also conducted in the office of the prosecuting United States Attorney, just prior to the first appearance of Defendant in Court. The inventory was not conducted immediately before he would have been turned over to the incarcerating authority, either the United States Marshal Service or at the pre-trial detention center. All of these circumstances suggest that an investigatory purpose may have motivated Agent Whiteman's inventory, at least in part.

Taking into consideration all the facts and circumstances, I conclude that the seizure of the five pieces of paper exceeded the scope of a proper inventory search. In making the obligatory inventory in connection with the transfer, Agent Whiteman was authorized to look at what was in the bag and inventory it. A cursory review of the miscellaneous papers, I conclude, was unavoidable in making such an inventory. But a more intrusive examination and match-up with names and addresses from his investigation was, needless to say, investigatory. The evidentiary nature of this content would only have been apparent to an investigator thoroughly immersed in the case, unlike a jailer

19

inventorying belongings prior to incarceration.

If these papers were in Defendant's possession when he was arrested, or in the automobile that was previously searched with a warrant, they were not seized then. More likely they were created or obtained by Defendant while he was incarcerated. Certainly they were not obvious contraband, nor, presumably, were they substantially different from the other papers that the agent included among the miscellaneous papers returned to Defendant's representative. See Gov't Exh. 7. Under these circumstances, the integrity of the inventory, qua valid inventory, was compromised by the close substantive examination of the content and the seizure because of the content. This case is akin to Khoury, where the review of Defendant's notebook after an inventory search was found to exceed the scope of a valid inventory search. See 901 F.2d at 959-60. Likewise, in this case, I conclude that the seizure of the papers should be suppressed and that the motion should therefore be **GRANTED** as to these documents.

### IV.
### Conclusion

In conclusion, I **RECOMMEND** that the motion to suppress statements, [Doc. 23], be **DENIED** and the motion to suppress the five pieces of paper, [Doc. 28], be **GRANTED**.

It appearing that there are no further pretrial or discovery matters to bring before the undersigned, it is therefore **ORDERED** that this **case** be and is hereby **CERTIFIED** as ready for trial.

20

**SO REPORTED AND RECOMMENDED**, this 20th day of November, 2014.

s/ *E. Clayton Scofield III*
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)