# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**UNITED STATES OF AMERICA**

**v.**

**COLE JAMAL DANIELS,**

**Defendant.**

1:13-cr-454-WSD

## OPINION AND ORDER

This matter is before the Court on Defendant Cole Jamal Daniels's ("Defendant" or "Daniels") Objections [62, 66] to Magistrate Judge E. Clayton Scofield, III's Reports and Recommendations [60, 64], issued on October 24 and November 20, 2014. The Magistrate Judge recommends that Defendant's Motion to Suppress Statements [23], and Motion to Suppress Evidence [24] derived from his arrest and the seizure of his vehicle, be denied. The Magistrate Judge also recommends that Defendant's Motion to Suppress Evidence Seized During Transfer [28] be granted.

## I.   BACKGROUND

On November 19, 2013, a federal grand jury returned an indictment [1] charging Defendant with two counts of commercial sex trafficking of a minors, in violation of 18 U.S.C. § 1591 (Counts One and Three), and two counts of

transporting a minor in interstate commerce for the purpose of prostitution, in violation of 18 U.S.C. § 2423 (Counts Two and Four).[1]

On January 16, 2014, Defendant filed his Motion to Suppress Statements [23] and Motion to Suppress Evidence [24].  Defendant argues that, on October 3, 2013, he was frisked and searched without reasonable suspicion, and then arrested without probable cause, all in violation of the Fourth Amendment.  Defendant seeks suppression of items seized from his person, including his keys, wallet and cellular telephone, and all evidence and testimony derived from the discovery and seizure of those items, including items in his vehicle, which, Defendant alleges, was wrongfully impounded and searched after his arrest.  Defendant asserts that statements he made at the scene and in custody must be suppressed as fruit of those alleged violations.  Defendant argues further that his October 4, 2013, statements were obtained in violation of his Fifth Amendment Miranda rights,[2] and must be suppressed for this additional reason.

On February 7, 2014, Defendant filed his Motion to Suppress Evidence Seized During Transfer [28].  Defendant argues that, during his transfer from state

---

[1]  On August 19, 2014, a superseding indictment [50] was returned also charging Defendant with two counts of intimidating a witness (Counts Five and Six).

[2]  Miranda v. Arizona, 384 U.S. 436 (1966).

to federal custody on December 18, 2013, five (5) pieces of paper were seized as evidence from among his personal belongings, in violation of the Fourth Amendment.

On April 24, 2014, and May 29, 2014, Magistrate Judge Scofield conducted an evidentiary hearing on Defendant's Motions.  Testimony was presented from Detective William Parton ("Detective Parton"), Officer Dustin Bak ("Officer Bak"), Lieutenant Heath Holcomb ("Lieutenant Holcomb"), and Detective Laurie Nicholson ("Detective Nicholson"), of the Alpharetta Police Department, and Special Agent Nathan Whiteman ("SA Whiteman") of the Federal Bureau of Investigation ("FBI").  Following the evidentiary hearing, the parties filed their post-hearing briefs [47, 49, 57].

On October 24, 2014, Magistrate Judge Scofield issued his Report and Recommendation ("October 24th R&R") [60], recommending that Defendant's Motion to Suppress Evidence [24] derived from his arrest and the impound of his vehicle be denied.

On November 20, 2014, Magistrate Judge Scofield issued his Report and Recommendation ("November 20th R&R") [64], recommending that Defendant's Motion to Suppress Statements [23] be denied, and Defendant's Motion to Suppress Evidence Seized During Transfer [28], be granted.

3

Defendant timely filed Objections [62, 66] to the R&Rs.

## II. FACTS[3]

A. October 3, 2013, Investigation and Arrest

On October 3, 2013, the Alpharetta Police Department Special Investigation Unit was conducting a prostitution sting operation at an extended stay hotel located at 3331 Old Milton Parkway in Alpharetta, Georgia. (Tr. 9-10). There were six (6) officers involved in the operation that night ("investigating officers"), including Detective Parton and Lieutenant Holcomb, who was supervising the operation. (Tr. 115-116). They rented several hotel rooms, one of which was being used as an "undercover room" where an undercover officer would meet an escort with whom he had arranged a "date." (Tr. 117). The other team members were stationed in another room, the "operations room," where they could monitor by video and audio the events in the undercover room. (Tr. 116-117). Detective Parton responded to an advertisement, posted on Backpage.com, for an escort

---

[3] Defendant asserts several objections to the facts set out in the R&Rs. Having compared Defendant's objections and his statement of the facts with the Magistrate Judge's summary in the R&Rs, significant and material discrepancies exist between them. In view of them, the Court chose to conduct an independent, *de novo* review of the testimony and evidence presented at the evidentiary hearing. The Court relies on its independent statement of the facts in deciding Defendant's Motions. In view of the Court's *de novo* evaluation of the facts, the Court sustains Defendant's objections to the facts set out in the R&Rs.

named "Desire."  (Tr. 12).[4]  He called the number on the advertisement and spoke with Desire, who agreed to meet him for a "date" at his hotel room for $160.  (Tr. 12-13).

Approximately one hour later, at about 4:30 p.m., Desire arrived at the undercover room and met Detective Parton.  (Tr. 13, 37).  Lieutenant Holcomb and the other members of the team were in the operations room monitoring Detective Parton and Desire.  (Tr. 117).  Detective Parton observed that Desire "looked very young," and he asked her age.  (Tr. 13).  Desire replied that she was eighteen. (Id.).  While in the hotel room, Desire received a telephone call and Detective Parton overheard Desire tell the caller that, for an hour of her time, it would cost him $160.  (Tr. 14).  Detective Parton then put $160 on the counter, and after she finished her call, Desire took the money and "disrobed very quickly."  (Id.).  He asked if there was anything that he could not do and Desire replied "you can do anything you want except I don't have anal sex."  (Tr. 15:21-24).  Detective Parton gave a signal and his team members, including Lieutenant Holcomb, entered and secured Desire.  (Tr. 16:6-8, 38, 118).

---

[4]  Desire's name also appears sometimes in the transcript as "Desiree."

Detective Parton conducted the interview of Desire and Lieutenant Holcomb was also present for some period of time. (Tr. 119-122). Detective Parton asked Desire for her name and birth date. (Tr. 16). He learned her name,[5] and that she was a minor. A law enforcement database search revealed that she was a runaway from Virginia. (Tr. 16:14-24). He asked D.G. how she got to the hotel and she told him that someone had dropped her off, but she did not know if that person was there. (Tr. 17). She described him as a slim, light-skinned black male. (Tr. 18, 120-121).

Detective Parton had D.G. send a text message to the man who brought her to the hotel, to determine his location. (Tr. 17, 120-121). Detective Parton and Lieutenant Holcomb noticed that the person D.G. texted was listed in her contacts as "Daddy." (Tr. 17, 121). In Detective Parton's experience investigating prostitution, especially prostitution of minors, "'Daddy' [is] commonly used by prostitutes to refer to their pimp. . . . [He estimated in] 90 percent of the prostitution arrests . . . made, that when they do have a pimp, they're definitely listed as a - - as Daddy or names like that." (Tr. 17:22-24, 18:4-7). Based on Lieutenant Holcomb's experience investigating vice crimes, that this person was

---

[5] Because D.G. is a minor, she is referred to by her initials.

listed as "Daddy" in D.G.'s phone indicated to him "that he was controlling her, that he was in fact her pimp." (Tr. 121:12-23). Once he had a basic description of the suspect, Lieutenant Holcomb left the room and started looking around the hotel to locate the person whom D.G. texted. (Tr. 121-122). The suspect sent a text in response to the text D.G. sent, which said he was "right beside [her] . . . at the Burger King." (Tr. 17). At some point, one of the investigating officers called Lieutenant Holcomb and told him that the suspect was at the Burger King, which was located 50 to 130 yards from the hotel, and Lieutenant Holcomb walked to the restaurant. (Tr. 127, 122).

Still at the hotel, Detective Parton asked D.G. to identify "Daddy," and she identified him as Cole Daniels. (Tr. 17). D.G. did not know the street address, but she told Detective Parton that she had been living with Daniels in Duluth, Georgia, for "a couple of months at the most." (Tr. 19). D.G. told Detective Parton that Daniels "helped [her] get from Virginia to Georgia," that she is living with him, and that "he brought [her] up here" which, Detective Parton testified, indicated to him "there was definitely a correlation there." (Id.). D.G. stated that Daniels drove her to the hotel in a silver Chevrolet Malibu (the "Malibu"). (Tr. 18:17-23). Detective Parton testified that a description of Daniels and the Malibu was broadcast over the police radio on a secure channel "so . . . if he was in the area,

7

we can at least interview him or detain him and interview him about if there's any involvement - - if he has any involvement in what's going on."  (Tr. 19-20).[6]

Officer Bak was on patrol, in uniform and in a marked Alpharetta Police car, patrolling near the hotel.  Officer Bak was not part of the undercover operation and he testified that he did not know anything about the investigation.  (Tr. 78, 84). Officers who were working a detail at the hotel "asked [over the police radio] for an additional officer in the area that could try to locate a suspect."  (Tr. 78:13). Officer Bak, who was between one tenth and three-tenths of a mile from the hotel, "was the closest one, so [he] told them that [he] would be en route to meet up with them."  (Tr. 78).

While on his way to the hotel, Officer Bak, using a radio channel separate from their main dispatch channel, "was able to talk with [the investigating officers] and communicate directly with them."  (Tr. 78-89).  They told Officer Bak "that [he] was to look for a silver Malibu that was supposedly in a parking lot and it was supposedly occupied by a black male driver in his mid 20's, and that they wanted [him] to try to locate that vehicle in the parking lot."  (Tr. 79).

Officer Bak located the vehicle "towards the end of the parking lot which

---

[6] It does not appear that Daniels's name was broadcast over the radio at that time.

was by the hotel and the gas station and Burger King that connect to it." (Tr. 79). Officer Bak told the investigating officers over the radio that the vehicle was unoccupied. (Id.). They told Officer Bak "that the suspect might be at the Burger King . . . and that he was possibly wearing a white t-shirt and a hat or some type of covering on his head." (Tr. 79-80). The investigating officers did not tell Officer Bak the name of the suspect or why they were looking for him. (Tr. 87).

Officer Bak walked into the Burger King and "observed a black male, mid-20s, with a black do rag on his head wearing a white t-shirt and pants. . . . [T]he only other people inside were the two employees that were behind the counter." (Tr. 80). Officer Bak approached him and "told him that [he] was looking for an individual that matched [his] description." (Tr. 88). Officer Bak asked him for identification and he "produced a[n] Oklahoma driver's license with the name of Cole Daniels." (Tr. 80, 88). Officer Bak radioed the dispatcher over the police records channel to check the information on his license, and the "dispatchers told [Officer Bak] that there was a possible warrant out for [Cole Daniels]" for a probation violation. (Tr. 98:14-15; see also Tr. 81, 96). Officer Bak testified:

> I detained him myself knowing that he had a possible warrant. That's when I put handcuffs on him and told him that he was being detained, he was not under arrest, that if the warrant did not come back to him

> and there was no - - he was not a person we were looking for, then
> handcuffs would be taken off and he would be released.

(Tr. 97:15-20; <u>see also</u> Tr. 89:3-9).  After placing Daniels in handcuffs, Officer

Bak "patted him down for weapons, and at that time had a phone - - cell phone, car

keys, and a wallet on him," which Officer Bak placed on the table next to where

Daniels was standing.  (Tr. 81:14-22; <u>see also</u> Tr. 89-90).  Officer Bak did not open

or search the phone.  (Tr. 82-83).

After Officer Bak detained Daniels because of the possible probation

violation warrant, the investigating officers told Officer Bak over the radio that

Daniels was the suspect they were looking for and to detain him.  (Tr. 89; <u>see also</u>

Tr. 81, 87).[7]  Officer Bak stated that the investigating officers had been monitoring

the records channel, and when he "ran the driver's license on [the police] records

channel, they were monitoring that and let [him] know that that was who they were

looking for."  (Tr. 87:1-11).  The investigating officers did not tell him why they

were looking for Daniels, but Officer Bak testified that he "assumed it was a

prostitution sting because [he was] coming to an extended stay [hotel]."  (Tr. 87).

Within five (5) minutes after Officer Bak first detained Daniels and removed

---

[7]  It is not clear whether it was "several minutes" or "within 30-45 seconds" after
Officer Bak detained Daniels that the investigating officers told Officer Bak that
Daniels was the suspect they were looking for.  (<u>Compare</u> Tr. 89 <u>with</u> Tr. 97).

the items from his pockets, Lieutenant Holcomb arrived at the Burger King and told Officer Bak to place Daniels under arrest, saying "code 20," which is the police signal for arrest.  (Tr. 92:5-7, 98:22-24, 122).  Lieutenant Holcomb told Daniels that he was under arrest for pimping.  (Tr. 102:12-21, 103:15-24, 122-123, 127-128).[8]  Lieutenant Holcomb testified that he made an assessment based on what he knew—including that Daniels had dropped off D.G. at the hotel, that he was supposed to pick her up, and that he was listed as "Daddy" in her cell phone— that Daniels had met all the elements for the offense of pimping because the "code for pimping in the state of Georgia . . . discusses a person who transports another for the purpose of prostitution whether knowingly or if they should have known." (Tr. 122-123; see also Tr. 125-126, 130-132, 134).  Officer Bak "patted [Daniels] down, searched him to make sure he didn't have any weapons or anything, illegal drugs, or anything on him.  [Officer Bak] walked him outside to [his] patrol car and placed him in the rear of [the] patrol car."  (Tr. 82:13-16).  The car keys were

---

[8]  Officer Bak first testified that Lieutenant Holcomb told Daniels that he was under arrest for prostitution of a minor.  (Tr. 92:22-24).  Officer Bak corrected himself on re-direct.  (Tr. 102-103).  Lieutenant Holcomb testified that he did not say that Daniels was under arrest for pimping of a minor and he never mentioned to Daniels D.G.'s age, or that she was a minor.  (Tr. 126-127, 129-132).  An arrest warrant was later issued charging Daniels with pimping of a minor and human trafficking for sexual servitude.  (Tr. 208:9-209:3).

left with Lieutenant Holcomb at the scene and Daniels's cell phone and wallet were placed in a bag and transported with Daniels to the Alpharetta Police Department.  (Tr. 82, 99-100).

     B.     <u>October 3, 2013, Vehicle Impound and Inventory Search</u>

The Alpharetta Police Department has a policy regarding impound of vehicles (the "Impound Policy"), which provides:

> If the driver of a motor vehicle has been arrested, the vehicle may be impounded when:
>
>     a.    There is no one present who is authorized and capable of removing the vehicle.
>
>     b.    The driver of the vehicle has been removed from the scene and is either physically or mentally unable to make a request for the disposition of his/her vehicle.  An officer may impound a vehicle for the protection of the vehicle and its contents under the provisions above.
>
>     c.    If the driver of a vehicle is arrested on private property, and the driver either owns, has control of, or has permission from the owner of the property, the vehicle should not be impounded except upon the request of the driver.

(Gov't Ex. 1 at 2; Tr. 22:3-8).

Detective Parton testified that, after he learned that Daniels had been located, his "primary concern" was to "ma[k]e sure that [Daniels's] vehicle was secured and remained on the scene until [he] was able to come down and process that part of the investigation."  (Tr. 20:15-21).  The Malibu was not parked

illegally and Detective Parton testified that he did not have reason to believe that it

had been improperly operated or was unable to be driven.  (Tr. 53:23-54:5).

Detective Parton testified that he decided to impound the Malibu because:

> A.     I mean, that it was in his possession based upon what officers
> were telling me, that is the vehicle he was driving, he had the keys for
> it, so, you know, we definitely weren't going to leave it there.  It's a
> pretty high crime area.  We didn't want the vehicle to be broken into
> or stolen.

> Q.     So, in other words, it was his arrest that authorized the
> impound; is that what you're saying?

> A.     Yes.

> Q.     And what makes you believe it was a high crime area that that
> car was somehow susceptible to loss or damage?

> A.     It's an extended stay hotel.

> Q.     So what you're saying is anybody who's in an extended stay, if
> they're arrested outside of their car, outside of their room at a
> restaurant for something, that you can just go impound their car?

> A.     I mean, if the vehicle is used in the crime, that's typically what
> does it.

> Q.     Okay.  So you're saying it has - - because it was connected to
> the crime, you decided that you were going to impound the car?

> A.     Right.

> Q.     Okay.

> A.     And it's in his possession.

(Tr. 57:3-58:1).  Detective Parton learned at some point that the Malibu was a

13

rental car, but he did not know to whom it had been rented.  (Tr. 52:21-53:10).

Detective Parton testified that he did not attempt to arrange for a third party to

remove the Malibu from the scene, including because there was no one present

who he knew was authorized to drive the Malibu and the policy of the police

department does not require him to try to find someone who might want to remove

a vehicle, whether or not it is a rental, after the driver of that vehicle is arrested.

(Tr. 54:11-21, 65-66).

      After Daniels had been taken into custody and transported from the scene,

Lieutenant Holcomb gave Detective Parton the keys to the Malibu.  (Tr. 47-48).

Detective Parton testified that his "date" with D.G. was the first case of the

operation that night, and he stayed at the hotel to assist with the additional dates

the investigating officers had arranged.  (Tr. 20:5-12).  The Malibu remained

locked while Detective Parton was inside the hotel.  (Tr. 25:24-25, 47:20-22).

      At 9:47 p.m., Detective Parton called for a wrecker service.  (Tr. 45:21-25).

At about 10:00 p.m., Detective Parton began filling out the inventory form for the

Malibu.  (Tr. 47:5-9).  Detective Parton testified that he conducted the inventory in

accordance with his department's policy (the "Inventory Policy"), which he

summarized:

> We have a form that we fill out, and we list all the items that were in
> the vehicle.  We list any damages on the car, and we have a - - we have

14

> the tow truck pick it up and take a copy of it with them.  But this is a complete inventory of everything in the car from front to back.  We look under hoods for contraband and [sic] drug investigations, and we look in the trunk.  We make sure there's no items of value there or anything illegal.  So this is a complete search of the vehicle or inventory.

(Tr. 22:24-23:6; see also Gov't Ex. 2 at 6).

Detective Parton conducted the inventory with the assistance of a uniformed officer.[9]  Detective Parton "called out all the items that [he] found in the vehicle" to the officer, who was standing two feet away and "was recording on our inventory impound sheet exactly what was in the vehicle."  (Tr. 26:3-11).  In the center console of the Malibu, Detective Parton found one Samsung tablet and "three auxiliary cords for phones and tablets-type use."  (Tr. 28:19-21; Gov't Ex. 3).  In the trunk, Detective Parton found one black backpack containing miscellaneous clothing, one pair of Air Jordan shoes, another pair of Nike shoes, a pair of boots, and blue bag also containing miscellaneous clothing.  (Gov't Ex. 3; Tr. 28:23-29:3;).  Detective Parton testified that he did not turn on the tablet, he did not remove anything, and the items remained inside the Malibu when he was finished.  (Tr. 29:4-10).  Detective Parton did not take pictures of the items or

---

[9]  Detective Parton testified that he could not recall the name of the uniformed officer and his name does not appear on the inventory form.  (Tr. 49:9-13).

document the individual articles of clothing. (Tr. 59:12-25). Detective Parton did not recall seeing a rental agreement in the Malibu, and he stated that even if one was there, it was not something that he would have documented on the inventory form because there "was no value to it [and he was] doing this to protect the owner of the vehicle and the police department from false allegations of theft and things like that." (Tr. 53:9-13, 66:17-23). The inventory form for the Malibu lists the owner as "rental" and it lists the "reason impounded" as "driver arrested." (Gov't Ex. 3). The spaces for "Operator," "Location of Inventory," "Officer Signature," and "Wrecker Driver" are blank. (Id.). After completing the inventory, the wrecker driver towed the Malibu from the scene and the inventory form was submitted to the police records department. (Tr. 29:11-20).[10]

C.    October 3 and 4, 2013, Interviews

After he learned D.G. was a minor, Lieutenant Holcomb contacted Detective Nicholson, the Alpharetta Police Department liaison to the FBI Match Task Force, which is comprised of local, state and federal law enforcement officers that investigate the commercial sexual exploitation of children, including juvenile prostitution. (Tr. 124:9-14, 135:12-25, 171:1-6). Detective Nicholson called SA

---

[10] On October 9, 2013, SA Whiteman obtained a federal warrant to search the Malibu. (Tr. 217).

Whiteman, one of the FBI Match Task Force coordinators, to report that Alpharetta Police recovered a juvenile and to request his assistance.  (Tr. 172:5-14).

Officer Bak transported Daniels in his patrol car from the scene to the Alpharetta Police Department Headquarters.  He testified that he did not question Daniels and he did not advise him of his <u>Miranda</u> rights.  Officer Bak testified that, while they were driving, Daniels stated "that he didn't realize it was illegal to give a minor a ride."  (Tr. 83).  Officer Bak testified that Daniels's statement was not in response to any questioning.  (Id.).

Daniels arrived at the Alpharetta Police Department Headquarters at 5:42 p.m.  (Tr. 95:23-96:3).  At approximately 8:30 p.m., SA Whiteman and Detective Nicholson interviewed Daniels in a small conference room that included a table and chairs.  (Tr. 173:16-174:15).  SA Whiteman and Detective Nicholson were casually dressed and their firearms were not visible.  (Tr. 137:18-25, 174:5-6).  Daniels's handcuffs were removed when he was brought into the room, and Detective Nicholson testified that Daniels was "calm, not excitable by any means . . . ."  (Tr. 138:7-13, 174:17-20).  SA Whiteman testified:

> As soon as he came into the room, we introduced ourselves.  I told him - - I showed him my credentials and told him that I was Special Agent Nathan Whiteman with the FBI in Atlanta, and I work with Detective Nicholson.  We are part of a task force.  We were called here just to kind of figure out what was going on.

17

He asked what he was doing there or kind of what was going on.  I told him that based upon what was told to me he was under arrest, and he was being charged with pimping of a minor as well as human trafficking for sexual servitude, both of those on the state charges.  I told him there were no federal charges against him at that point.

Q.      Okay.  Do you recall what, if anything, else Mr. Daniels said?

A.      He said I can't believe that she was 16.  When he said that, I said I'm interested in hearing what you have to say, but before we get into any of those things and I ask you any questions, I have to advise you of your rights.

(Tr. 175:3-20).[11]  SA Whiteman then showed Daniels an advice of rights form (the

"Waiver Form"), which he read aloud and reviewed with Daniels.  (Tr. 177-178).

The Waiver Form states:

YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

---

[11]  SA Whiteman testified that, after he and Detective Nicholson interviewed D.G. and confirmed she was a minor, he discussed with Lieutenant Holcomb and an Assistant District Attorney for Fulton County the circumstances of the case and they determined that those charges would be appropriate before he interviewed Daniels.  (Tr. 207, 208:9-209:3).

If you cannot afford a lawyer, one will be appointed for you before
any questioning if you wish.

If you decide to answer questions now without a lawyer present, you
have the right to stop answering at any time.

WAIVER OF RIGHTS

I have read this statement of my rights and I understand what
my rights are.  At this time, I am willing to answer questions without a
lawyer present.

(Gov't Ex. 4).  Daniels stated that he understood his rights, he reviewed the Waiver

Form and signed it.  (Id.; Tr. 177-178).  SA Whiteman testified that Daniels "was

pleasant, cooperative.  He was at ease showing no signs of agitation,

uncooperativeness, anything like that, combativeness."  (Tr. 179:6-10).

At the "very beginning of the interview,"[12] SA Whiteman inventoried in

front of Daniels the contents of his wallet, which included cash and credit cards,

some of which were not in Daniels's name and which SA Whiteman seized.[13]  (Tr.

181).  SA Whiteman stated that he inventoried the contents of the wallet because

Daniels would not be permitted to take the items with him to the Fulton County

---

[12]  It is not clear whether the inventory and discussion about the cell phone
occurred before or after Daniels's statement regarding D.G.'s age and the
administration of his Miranda rights.

[13]  SA Whiteman testified that he "had to contact the proper owners of those credit
cards to ensure that he had authorization to have those."  (Tr. 182:3-6).

Jail.  (Tr. 181, 205).  Daniels initially consented to a search of his cell phone, but revoked his consent after SA Whiteman reviewed with him the consent-to-search form and explained that his consent would authorize the FBI to use evidence seized from his phone against him at a court hearing.  (Tr. 180-181).[14]

SA Whiteman conducted the interview, which lasted about an hour to an hour and a half.  (Tr. 143, 179).  Detective Nicholson was present throughout the interview.  Daniels did not revoke his waiver of rights or request a lawyer during the interview, and SA Whiteman testified that he appeared to be comfortable during the entire process.  (Tr. 179:15-20).  At some point after the interview, Daniels was transported to the Fulton County Jail.

The next day, on October 4, 2013, Detective Nicholson went to the Fulton County Jail to speak with Daniels, who was still in "intake."  (Tr. 140, 144).  Detective Nicholson was "made aware of a public health issue" concerning D.G. and she testified that she "felt that Mr. Daniels should be aware of the issue in case he wanted to be tested for anything."  (Tr. 140:10-18).

Detective Nicholson stated that Daniels "looked fine.  There was nothing to make [her] think that he was distressed or anything along those lines."

---

[14]  A search warrant was later obtained for the cell phone.  The cell phone was not searched based on consent.  (Tr. 181:3-9).

20

(Tr. 148:19-22).  She did not reread him his <u>Miranda</u> rights.  (Tr. 151:22-152:1).

Detective Nicholson told Daniels, "what we discussed last night was still in effect,

that he could - - he did not have to talk to me if he didn't want to, and that he could

tell me to leave at any time, and I would."  (Tr. 141:20-24, 151-152).[15]  Daniels did

not ask her to leave or indicate that he did not want to talk to her.  (Tr. 141-142).

Detective Nicholson told Daniels that D.G. had tested positive for HIV.

Daniels became upset, shook his head, put his head down, rubbed his forehead and

stated that he had unprotected oral sex and protected intercourse with D.G.

(Tr. 141, 150:19-151:11).  Detective Nicholson testified that Daniels's statement

was not in response to any questions about health status.  (Tr. 155).  Detective

---

[15]  On cross examination, Detective Nicholson testified:

> Q.     And exactly what did you tell him?  Is what you said on direct
> that what we discussed the night before was still in effect?
>
> A.     All your rights what we discussed the night before are still in
> effect, you didn't have to talk to me.
>
> . . .
>
> I don't remember exactly what I said, but I said the fact of what we
> talked about last night as far as your rights, you don't have to talk to
> me if you don't want to.

(Tr. 151:17-21, 152:4-6).

Nicholson then asked Daniels to whom the Samsung tablet belonged. Daniels stated it belonged to Rubin Walls and that the telephone number for him might be in his cell phone. (Tr. 142). Detective Nicholson asked whether there was a password on the tablet or phone and Daniels replied no. (Id.). The encounter between Daniels and Detective Nicholson lasted approximately fifteen to thirty minutes. (Tr. 156).

D.     Transfer from State to Federal Custody

On December 18, 2013, after Defendant had been indicted on federal charges, SA Whiteman and FBI Special Agent Joe Fonseca ("SA Fonseca") executed a warrant for his arrest and transported Daniels from the Fulton County Jail to federal custody. (Tr. 184, 190). When the agents took custody of Daniels at the Fulton County Jail, he carried with him a brown paper bag containing his personal property. (Tr. 184). SA Whiteman asked Daniels if he remembered him, and Daniels stated that he did. (Tr. 195). SA Whiteman advised Daniels that he had been indicted by a federal grand jury, summarized the charges, and stated that he was being taken into federal custody. (Tr. 195:19-196:1). SA Whiteman handcuffed Daniels and transported him in his FBI vehicle to the Atlanta Police

22

Department for fingerprinting and booking, then to the federal building.

(Tr. 196:2-10, 200:15-201:7).[16]

At the United States Attorney's Office, SA Whiteman conducted an inventory search of Daniels's personal property that was contained in the brown paper bag, which consisted of a check payable to Daniels, a notebook, a magazine, previously opened mail, rap lyrics, and five (5) pieces of paper with the names, nicknames and contact information for individuals whom, SA Whiteman believed, were victims or potential witnesses in this case.  (Tr. 184, 190-191, 202).  SA Whiteman testified that he recognized the names from his investigation of this case and he seized the five pieces of paper as evidence.  (Tr. 202-204).  The rest of the items from the bag were later given to Daniels's family member.  (Tr. 185-186).

SA Whiteman testified that he conducted an inventory of the items in the brown paper bag pursuant to an FBI policy requiring an inventory of the personal property of an individual who is arrested.  (Tr. 185-188).  The FBI policy provides that "personal property removed from a person who has been arrested and is to be incarcerated should be carefully inventoried and promptly, thoroughly searched by Agents prior to being stored for safekeeping."  (Gov't Ex. 5).

---

[16]  The FBI maintains a federal booking station at the Atlanta Police Department. (Tr. 200:19-20).

## III.   LEGAL STANDARD

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; Williams v. Wainwright, 681 F.2d 732 (11th Cir. 1982), cert. denied, 459 U.S. 1112 (1983).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party."  Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990) (internal citations omitted).  With respect to those findings and recommendations to which objections have not been asserted, the Court must conduct a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983), cert. denied, 464 U.S. 1050 (1984).

Defendant objects to all but one of the Magistrate Judge's recommendations. The Court conducts a *de novo* review of Defendant's Objections, and in doing so, the Court relies on its independent determination of the facts, as set out above.

## IV.    DISCUSSION

### A.    Defendant's October 3, 2013, Arrest and Search of His Person

Defendant does not challenge the initial investigatory stop, or his subsequent detention and handcuffing after Officer Bak discovered the possible probation violation warrant.  Defendant argues that Officer Bak's frisk of him, and the removal of his wallet, keys and cell phone when he was detained, but before he was arrested, was not permissible under Terry v. Ohio, 392 U.S. 1 (1968), in the absence of any facts supporting a reasonable suspicion that Defendant was armed and dangerous.[17]

The Government "concedes that Officer Bak did not have reason to believe that Defendant was armed and dangerous when he initially encountered Defendant and frisked him."  (Gov't Resp. [49] at 19).  The Government argues that the items ultimately seized are not required to be suppressed because, under the inevitable discovery exception, these items would have been found during a lawful search incident to Daniels's arrest, and, at the time of the search, Lieutenant Holcomb was

---

[17]  Under Terry, an officer who makes a lawful investigatory stop may conduct a limited pat-down, or frisk, of the suspect's outer clothing if the officer has a reasonable suspicion that the suspect poses a threat to the officer's safety or the safety of others.  Terry, 392 U.S. at 27-30; see also Arizona v. Johnson, 555 U.S. 323, 327 (2009) (stating that, under Terry, "police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous").

actively looking for Defendant and had probable cause to arrest him.

Defendant contends that the inevitable discovery exception does not apply because probable cause did not exist to arrest him.  Defendant seeks to suppress all evidence identified during Officer Bak's detention and which was ultimately seized, including the Malibu and its contents.  He also moves to suppress any statements he made to law enforcement, and the wrongful seizure of evidence, as fruit of the alleged arrest without probable cause and Fourth Amendment violations.  The Court first considers whether probable cause existed to arrest Defendant.

"Law enforcement officers have probable cause to arrest when the facts and circumstances within their collective knowledge, 'or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense.'"  United States v. Wall, 343 F. App'x 564, 567 (11th Cir. 2009) (quoting Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir. 1997) (en banc)).  "[P]robable cause . . . is a doctrine of reasonable probability and not certainty."  United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995).

Whether probable cause exists is evaluated based on the "totality of the circumstances."  Illinois v. Gates, 462 U.S. 213, 233 (1983).  A court may consider

26

the involved officers' experience, because "[c]onduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer." United States v. Gonzalez, 969 F.2d 999, 1003-04 (11th Cir. 1992). "[P]robable cause . . . can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest, when there is some degree of communication between the two." United States v. Nieto, 510 F.2d 1118, 1120 (5th Cir. 1975), cert. denied, 423 U.S. 854 (quotation and citation omitted);[18] see also United States v. Allison, 953 F.2d 1346, 1350 (11th Cir. 1992) ("Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause.") (citation omitted).

Here, the totality of the circumstances reasonably led the officers to believe that Defendant had engaged in criminal conduct, specifically pimping.  Georgia law provides that a person commits the offense of pimping when he or she directs or transports another person to a place when he or she knows or should know that the direction or transportation is for the purpose of prostitution.  O.C.G.A.

---

[18]  In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Former Fifth Circuit issued before the close of business on September 30, 1981.

§ 16-6-11.  Detective Parton and the investigating officers, including Lieutenant Holcomb, knew that D.G. was engaging in prostitution and D.G. said that a "friend" drove her to the hotel.  D.G. provided a physical description of Defendant and the clothes he was wearing.

Detective Parton and Lieutenant Holcomb also saw that D.G.'s "friend" was listed in her phone as "Daddy," which, based on their experience investigating prostitution, indicated that D.G.'s "friend" was likely her pimp.  D.G. told Detective Parton that "Daddy" was Cole Daniels, and that he drove her to the hotel in a silver Malibu, "helped her get from Virginia to Georgia," and that she was living with him.  Detective Parton knew that Daniels was near the hotel at the Burger King.  Officer Bak located Daniels based on the information the investigating officers gave him—that the suspect was a black male in his mid-twenties, wearing a white t-shirt, pants, and a hat or some type of head covering, and that he might be at the Burger King—and the investigating officers told Officer Bak, after they heard Officer Bak over the radio run a records check for Cole Daniels, that Cole Daniels was the name of the suspect they were looking for and to continue to detain him.  One of the investigating officers called Lieutenant Holcomb and told him that the suspect was at the Burger King.

28

When Lieutenant Holcomb arrived at the Burger King, he had sufficient facts to reasonably believe that Daniels drove D.G. to the hotel and that Daniels knew, or should have known, that D.G. was engaging in prostitution at the hotel. See O.C.G.A. § 16-6-11.[19]   Lieutenant Holcomb told Officer Bak to place Daniels under arrest for pimping, and Officer Bak was entitled to rely on the collective knowledge of Lieutenant Holcomb, and the investigating officers, to arrest Daniels. See Wall, 343 F. App'x at 567; Nieto, 510 F.2d at 1120; Gonzalez, 969 F.2d at 1003-04.

After a *de novo* review of Defendant's objection to the Magistrate Judge's finding of probable cause, the Court finds that the facts and circumstances within

---

[19]  To the extent Defendant argues that there are no facts to support that he knew or should have known that he drove D.G. to the hotel for the purpose of prostitution, Detective Parton and Lieutenant Holcomb testified that, based on their experience investigating prostitution, that the person who drove D.G. to the hotel was listed in her contacts as "Daddy," indicated to them that person was likely her pimp.  See Gonzalez, 969 F.2d at 1003-1004 (in determining whether probable cause existed, court may consider the involved officers' experience, because "[c]onduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer").  Lieutenant Holcomb testified that when he arrived at the Burger King, he told Officer Bak to arrest Daniels because he made an assessment, based on what he knew—including that Daniels drove D.G. to the hotel and was also listed as "Daddy" in D.G.'s phone—that Daniels had met all the elements for the offense of pimping because the "code for pimping in the state of Georgia . . . discusses a person who transports another for the purpose of prostitution whether knowingly or if they should have known."  (Tr. 122-123; see also Tr. 125-126, 130-132, 134).

the collective knowledge of the officers was sufficient to support a reasonable belief that Daniels had engaged in criminal conduct.  The Court concludes that probable cause existed to arrest Daniels and his objection is overruled.

Having found that probable cause existed to arrest Daniels, the Court concludes that the evidence Officer Bak seized from Defendant during his unlawful search is not required to be suppressed because those items inevitably would have been discovered during a search incident to Defendant's lawful arrest.[20]  Under the inevitable discovery exception to the exclusionary rule, "the government may introduce evidence that was obtained by an illegal search if the government can establish a 'reasonable probability that the evidence in question would have been discovered by lawful means.'"  United States v. Johnson,

---

[20]  The Magistrate Judge found that Officer Bak's search was permissible as a search incident to arrest because, and at the time of the search, the police collectively knew enough to establish probable cause to arrest Daniels, and the search occurred only five minutes before his arrest.  The record does not support that the investigating officers had communicated to Officer Bak, at the time of the search, sufficient facts or circumstances indicating that probable cause existed to arrest Daniels.  The officers asked Officer Bak to help *locate* a suspect and Officer Bak knew only his physical description and possible location.  Officer Bak did not have probable cause to arrest Daniels before Lieutenant Holcomb arrived at the Burger King and told Officer Bak to arrest him, five minutes after the search occurred.  Defendant's objection to the Magistrate Judge's finding that Officer Bak's search was justified as a search incident to arrest is sustained and the Court rejects this portion of the October 24th R&R.

-- F.3d --, 2015 WL 408149, at *3 (11th Cir. 2015) (quoting Jefferson v. Fountain,

382 F.3d 1286, 1296 (11th Cir. 2004)); see also Nix v. Williams, 467 U.S. 431

(1984).  "The government must also establish that 'the lawful means which made

discovery inevitable were being actively pursued prior to the occurrence of the

illegal conduct.'"  Id. (quoting Jefferson, 382 F.3d at 1296).

It is undisputed that Daniels's wallet, keys and cell phone would have been

discovered during a search incident to his arrest.  See United States v. Robinson,

414 U.S. 218, 224 (1973) ("[A] search incident to a lawful arrest is a traditional

exception to the warrant requirement of the Fourth Amendment."); Virginia

v. Moore, 553 U.S. 164, 178 (2008) (Searches of an arrestee incident to a lawful

arrest "enable[] officers to safeguard evidence, and, most critically, to ensure their

safety during the 'extended exposure which follows the taking of a suspect into

custody.'") (quoting Robinson at 234-235).  At the time the wallet, keys and cell

phone were identified and placed on the table in front of Defendant,[21] Lieutenant

Holcomb was actively searching for the suspect and he had probable cause to arrest

---

[21]  The Court notes that the retrieval of the wallet, keys and cell phone during the
Terry stop portion of Officer Bak's encounter with Defendant likely did not
constitute an unreasonable seizure considering that Officer Bak told Defendant
that, if there was no warrant outstanding against him, he would be released,
implying that the wallet, keys and cell phone also would be allowed to be taken
with him.

him for pimping.[22]  Five short minutes after Defendant was detained and the items

placed on the table, Lieutenant Holcomb arrived and Defendant was arrested.

After a *de novo* review, the Court finds that the items Officer Bak seized from

Defendant during his unlawful search inevitably would have been discovered

during a lawful search incident to Defendant's arrest, and they are not required to

be suppressed.

B.   Inventory Search of the Malibu

Defendant next objects to the Magistrate Judge's conclusion that Detective

Parton's decision to impound the Malibu, and the inventory search of the car, were

constitutional.  An inventory search conducted according to standardized criteria

constitutes one of the well-defined exceptions to the probable cause and warrant

---

[22]  To the extent Defendant argues that at the time of the search, Lieutenant Holcomb was just looking for Daniels and had not decided to arrest him yet, "'[a]ctive pursuit' does not require that police have already planned the particular search that would obtain the evidence.  The government must instead establish that the police would have discovered the evidence 'by virtue of ordinary investigations of evidence or leads already in their possession.'"  Johnson, 2015 WL 408149 at *3 (quoting United States v. Virden, 488 F.3d 1317, 1323 (11th Cir. 2007)).  The Eleventh Circuit has stated that "the purpose of the requirement of active pursuit is to exclude evidence that was not being sought in any fashion."  Id. at *5.  Here, "[s]ubstract [Officer Bak's] illegal search from the factual picture in this case and nothing of substance would have changed."  See id. (quotation and citation omitted).  This assumes that Officer Bak's search was illegal, which the Court assumes for the purposes of its analysis.

requirements of the Fourth Amendment.  Colorado v. Bertine, 479 U.S. 367, 371 (1987); South Dakota v. Opperman, 428 U.S. 364 (1976).  To uphold a search under the inventory search doctrine, "the police must first have the authority to impound the vehicle and must then follow the procedures outlined in the [standardized impound] policy."  United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991).

Law enforcement may lawfully impound a vehicle when they have arrested its occupant—even if the vehicle is not impeding traffic or otherwise presenting a hazard—"so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity."  Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992) (quoting Bertine, 479 U.S. at 375).  The decision to impound an arrestee's vehicle must be made "in good faith, based upon standard criteria, and not solely based upon suspicion of criminal activity."  Id. (internal citation omitted).  Police do not violate an arrestee's Fourth Amendment rights merely by impounding a vehicle rather than permitting him to make alternative arrangements for the vehicle's disposition.  Bertine, 479 U.S. at 373-74.

Once lawfully impounded, law enforcement "may conduct an inventory search, including a search of closed containers, provided the search is conducted

pursuant to standardized criteria." Sammons, 967 F.2d at 1543. The requirement

of a standardized impound policy "ensures that an inventory search is not a ruse for

a general search to discover incriminating evidence." Florida v. Wells, 495 U.S. 1,

4 (1990). "An inventory search is not a surrogate for investigation, and the scope

of an inventory search may not exceed that necessary to accomplish the ends of the

inventory." United States v. Khoury, 901 F.2d 948, 958 (11th Cir. 1990) (citing

United States v. Laing, 708 F.2d 1568, 1570 (11th Cir. 1983)).

The City of Alpharetta Department of Public Safety Impound Policy

provides:

> If the driver of a motor vehicle has been arrested, the vehicle may be
> impounded when:
>
> > a.  There is no one present who is authorized and capable of
> >     removing the vehicle.
> >
> > b.  The driver of the vehicle has been removed from the scene
> >     and is either physically or mentally unable to make a request
> >     for the disposition of his/her vehicle. An officer may
> >     impound a vehicle for the protection of the vehicle and its
> >     contents under the provisions above.
> >
> > c.  If the driver of a vehicle is arrested on private property, and
> >     the driver either owns, has control of, or has permission
> >     from the owner of the property, the vehicle should not be
> >     impounded except upon the request of the driver.

(Gov't Ex. 1 at 2).

It is undisputed that no one was present at the scene who was authorized to

remove the Malibu, and it does not appear that Defendant requested that the

vehicle be released to a third party.  (Tr. 56-57, 66).  Detective Parton testified that

he impounded the vehicle because Defendant was arrested, and

> . . . it was in his possession based upon what officers were telling me,
> that is the vehicle he was driving, he had the keys for it, so, you know,
> we definitely weren't going to leave it there.  It's a pretty high crime
> area.  We didn't want the vehicle to be broken into or stolen.

(Tr. 57:4-8).  To the extent Defendant challenges Detective Parton's authority to

impound the Malibu because he was not a "driver," courts have held that an

officer's decision to impound the vehicle of a person arrested away from his

vehicle, for other than a motor vehicle infraction, was a "legitimate exercise of the

arresting officer's community caretaking function," when the circumstances

present "an appreciable risk of vandalism or theft."  United States v. Staller, 616

F.2d 1284, 1290 (5th Cir. 1980) (driver arrested inside mall for passing counterfeit

money; officers had authority to impound rental vehicle legally parked in mall

parking lot where driver was from another state, no one was present to take

possession of vehicle, officer "had every reason to expect that [arrestee] would be

separated from [his] vehicle for an extended period of time," and "officers were

aware that a car parked overnight in a mall parking lot runs an appreciable risk of

vandalism or theft," likelihood of which "would increase with every passing day"),

cert. denied, 449 U.S. 869; see also United States v. Foskey, 455 F. App'x 884,

889-890 (11th Cir. 2012) (established practice within police department authorized impounding an unsecured vehicle, practice was reasonably related to community caretaking function, and officers impounded van, pursuant to practice, because defendant was arrested, van's windows were open making it "not secure," they could not find keys to the van, and no one else was present to remove van); United States v. Gravitt, 484 F.2d 375, 380 n.5 (5th Cir. 1973) (rejecting argument that car parked at motel should not have been impounded because motel rent was paid through two days after arrest; officers thought arrestee would be away from car for longer than two days, during which unattended car or its contents could have been stolen or damaged); United States v. Vernon, 511 F. App'x 318, 322 (5th Cir. 2013) (impound reasonable where defendant arrested inside casino and taken to jail with little likelihood of returning to car soon, no known adult present to take custody of car, and officers thought car parked in casino parking lot ran high risk of vandalism or theft); United States v. Petty, 367 F.3d 1009 (8th Cir. 2004) (when car parked in lot of business closed for night after driver's arrest, but car belonged to leasing company and area was known for narcotics and prostitution, proper to impound car "for safekeeping . . . until it could be retrieved by the owner").

Detective Parton was authorized to impound the Malibu because the person who drove it had been arrested, it was parked in a high crime area, and there was no one

else present authorized to remove the Malibu.[23]

To the extent Defendant asserts that "[i]f his concern was to care for the property, [Detective Parton] surely would have contacted the lessee, whose name was readily apparent from the rental agreement," police officers have discretion whether or not to impound a vehicle, and they do not violate an arrestee's Fourth Amendment rights merely by impounding a vehicle rather than permitting him to make alternative arrangements for the vehicle's disposition.  See Bertine, 479 U.S. at 373-74.  Detective Parton testified that, although he knew that the Malibu was a rental vehicle, he did know to whom it was rented and he did not remember seeing the rental agreement in the vehicle.  Nothing in the Alpharetta policy requires an officer to contact a third party to retrieve a vehicle, whether it is a rental vehicle or not, especially when an arrestee has not requested that he do so.  Detective Parton was authorized to impound the Malibu and his decision to impound it was made in good faith.  See Sammons, 967 F.2d at 1543.

Defendant argues that Detective Parton's statements that he also decided to impound the vehicle because it was connected to a crime shows that his testimony

---

[23]  Detective Parton stated that he thought it was a high crime area because it was an extended stay hotel.  That an undercover prostitution sting was being conducted at that hotel also supports his conclusion that an unattended vehicle would be susceptible to theft or damage.

regarding the "community caretaking function" was pretext for wanting to search the vehicle.  The Court disagrees.  Detective Parton's statements that he wanted to make sure the Malibu was secure until he had time to process it as part of the investigation, and that "if the vehicle is used in the crime, that's typically what does it," do not support that Detective Parton decided to impound the Malibu *solely* to search it.  "[T]he mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search." United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir. 1990) (quoting United States v. Bosby, 675 F.2d 1174, 1179 (11th Cir. 1982)).  That Detective Parton did not turn on the tablet, did not remove anything from the vehicle, did not take pictures of the items and did not inspect or document the individual articles of clothing or paperwork found in the vehicle, supports that Detective Parton was not seeking to conduct a full investigatory search of the Malibu.  (Tr. 29:4-10; 59:12-25).  See Roberson, 897 F.2d at 1096; see also United States v. Orozco, 715 F.2d 158, 161 (5th Cir. 1983) (inventory search is lawful even though it may also be an investigatory search, "so long as [the inventory] was one of the police motives"); United States v. Cecala, 203 F.3d 836 (10th Cir. 2000) (inventory search lawful where officer said suitcase might contain contraband; "[w]hile mixed motives or suspicions undoubtedly exist in

many inventory searches, such motives or suspicions alone will not invalidate an otherwise proper inventory search").

Finally, to the extent Defendant argues that Detective Parton did not comply with the Inventory Policy procedure because he failed to complete the inventory form and did not list all contents of the Malibu, "[a]n officer's failure to complete a written inventory form does not necessarily invalidate an inventory search." United States v. Westerman, 418 F. App'x 822, 823 (11th Cir. 2011); United States v. O'Bryant, 775 F.2d 1528, 1534 (11th Cir. 1985) (inventory of briefcase contents not invalid because inventory form not complete; "reasonableness of an official invasion of [a] citizen's privacy must be appraised on the basis of the facts as they existed at the time that the invasion occurred"); cf. Whren v. United States, 517 U.S. 806, 816 (1996) (although adherence to procedures shows lack of pretext, deviation from procedures does not prove pretext).

Here, Detective Parton listed all of the contents of the Malibu using general descriptions, such as "miscellaneous paperwork" and two bags containing "miscellaneous clothing," and he testified that he remembered seeing those kinds of items and he did not have any reason to believe that the inventory of items listed on the impound form was inaccurate.  (Gov't Ex. 3; Tr. 66:24-67:11).  Detective Parton testified that he did not document paperwork individually because there

"was no value to it [and he was] doing this to protect the owner of the vehicle and the police department from false allegations of theft and things like that." (Tr. 66:14-23; see also Tr. 58:23-59:3).  The Court finds that the inventory search of the Malibu substantially complied with the procedure and purpose of the Inventory Policy and was not unreasonable.  See Westerman, 418 F. App'x at 823; United States v. Trullo, 790 F.2d 205, 206 (1st Cir. 1986) (stating, "[w]e will not hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search").

After a *de novo* review, the Court finds that the impound and inventory search of the Malibu was conducted in good faith and in accordance with the City of Alpharetta Department of Public Safety policies.  The Court concludes that the impound and inventory search did not violate the Fourth Amendment and any evidence derived from the impound or inventory is not required to be suppressed. Defendant's objection is overruled.[24]

---

[24]  The Government asserts that Detective Parton would have been authorized to search the Malibu incident to Defendant's arrest because it would have been reasonable for him to believe that evidence related to pimping might be found there.  (Resp. [49] at 29).  Detective Parton limited the scope of his search to comply with the Inventory Policy and he did not testify that he had reason to believe that the Malibu contained evidence of pimping.

C.     Defendant's October 4, 2013, Statements to Detective Nicholson[25]

Defendant argues that his October 4, 2013, statements to Detective

Nicholson were not voluntary and must be suppressed because she did not properly

advise him of his Miranda rights.  Defendant objects to the Magistrate Judge's

conclusion that Detective Nicholson was not required to remind Defendant of his

Miranda rights, of which he was advised and had waived the night before.

Warnings under Miranda "are required before any statement may be

admitted . . . elicited from a person in custody through interrogation."  Endress

v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).  "[N]o talismanic incantation" is

required to fulfill the requirement of the Miranda warning; all that it required is

that the warning be "effective."  California v. Prysock, 453 U.S. 355, 359 (1981).

Once a Miranda warning has been given, it "obviates the need for a case-by-case

---

[25]  To the extent Defendant argues that all of his statements must be suppressed as
fruit of the alleged Fourth Amendment violations, having found that his arrest and
the impound of the Malibu were not unconstitutional, Defendant's objection is
overruled.  Defendant does not contend that his October 3, 2013, statements,
including to Officer Bak and to SA Whiteman before he was read his Miranda
rights, must be suppressed for any other reason.  (Objs. [66] at 9 n.3).  To the
extent Defendant seeks to suppress his statement made to Lieutenant Holcomb at
the scene that the phone Officer Bak seized belonged to his grandmother, the
Government states in its Response that it will not seek to introduce this statement
at trial, but does not waive its right to use it for impeachment or other permissible
purposes.  (Resp. [49] at 30 n. 8).

inquiry into the actual voluntariness of the omissions of the accused." Id. Miranda

rights can only be waived if the waiver was voluntary and knowing:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) (citation omitted).

It is undisputed that, on October 3, 2013, SA Whiteman properly advised

Defendant of his Miranda rights and Defendant does not challenge his October 3,

2013, waiver, in writing, of those rights.  Defendant argues, however, that his

statements to Detective Nicholson on October 4, 2013, were not knowing and

voluntary because she did not re-advise him of his Miranda rights before their

conversation, and, even if her "passing reference" to his Miranda rights was

sufficient, it cannot be implied that Defendant voluntarily and knowingly waived

his rights.

It is well-settled that "[p]olice are not required to rewarn suspects [of their

Miranda rights] from time to time."  Berguis v. Thompkins, 560 U.S. 370, 386

(2010); see also Shriner v. Wainwright, 715 F.2d 1452, 1456 (11th Cir. 1983)

("[A]n accused does not have to be continually reminded of his <u>Miranda</u> rights once he has knowingly waived them.") (citations omitted).  The mere passage of time, or a change in location or interrogator, does not invalidate an otherwise effective <u>Miranda</u> warning.  <u>See</u> <u>Ballard v. Johnson</u>, 821 F.2d 568, 571-72 (11th Cir. 1987) (defendant not required to be re-advised of <u>Miranda</u> rights where he was fully advised of rights earlier the same day before transport from police station to sheriff's department); <u>Biddy v. Diamond</u>, 516 F.2d 118, 122 (5th Cir. 1975) (no new warning required where defendant indicated she remembered administration of her <u>Miranda</u> rights twelve days earlier); <u>United States v. Hopkins</u>, 433 F.2d 1041 (5th Cir. 1970), <u>cert. denied</u>, 401 U.S. 1013 (1971) (change from state police officer questioning defendant about state crime to federal officer questioning about federal crime did not require new warning); <u>see</u> <u>also</u> <u>United States v. Clay</u>, 408 F.3d 214, 222 (5th Cir. 2005) (new warning not necessary where there was no evidence that defendant no longer understood warnings or did not understand their applicability to interrogation two days after initial warning); <u>United States v. Andaverde</u>, 64 F.3d 1305, 1312 (9th Cir. 1995) (confession one day after <u>Miranda</u> warning still voluntary because defendant must have known that his rights had not materially changed simply because he had changed location and faced new interrogator).

In Jarrell v. Balkcom, 735 F.2d 1242 (11th Cir. 1984), the Eleventh Circuit rejected an arrestee's argument that his Miranda warnings should have been "refreshed," and thus, his confession was inadmissible, where three (3) hours had passed since he was advised of his Miranda rights at the scene by Investigator Bishop, during which time he was transported to police headquarters and interviewed by Sergeant Blannott; driven to the district attorney's office, where a polygraph was administered; and driven back to headquarters, arrested by Blannott and interrogated for an additional 30 to 45 minutes before confessing. 735 F.2d at 1253-54. The court found that although he was not technically in custody at the time, Jarrell was a suspect from the moment the warnings given, and the record showed that the warnings were complete and he understood them. Id. at 1254. That Jarrell confessed to an officer (Blannott) other than the one who administered the Miranda warnings (Bishop) did not render the warnings insufficient, including because, before interrogating Jarrell, Blannott asked Bishop in Jarrell's presence whether he had received his Miranda warnings. Id. The court concluded that Jarrell's rights were not violated by the failure to reissue Miranda warnings "because the totality of the facts do not reflect that Jarrell was unaware of his rights, that he was pressured, or that he was mentally deficient or naive about the process that was under way. Additionally, Jarrell had had previous experience

44

with law enforcement officers where his rights were explained." Id.

Defendant argues that Jarrell does not apply here because he did not affirmatively respond to Detective Nicholson's October 4, 2013, statement regarding his rights and a continued waiver of his rights cannot be implied from his silence. The Court disagrees. There is no requirement that a waiver be express. "[A] waiver of Miranda rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" Thompkins, 560 U.S. at 384 (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979)). "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Id.

In Thompkins, the Supreme Court held that the arrestte, understanding his rights in full, waived his right to remain silent by making a voluntary statement to the police. The Court found that there was no evidence to conclude that Thompkins did not understand his Miranda rights, including because he received a written copy of the Miranda warnings, the officer who administered the warnings determined that he could read and understand English, and Thompkins was given time to read the warnings. Id. at 387-386. Thompkins was told, "you have the right to decide at any time before or during questioning to use your right to remain

45

silent and your right to talk with a lawyer while you are being questioned," and the Court found that Thompkins was aware that his right to remain silent would not dissipate after a certain amount of time and he could assert his rights at any time. Id.

Here, Detective Nicholson was not required to fully re-administer Miranda warnings to Defendant on October 4, 2013, and there is no evidence to support that Defendant no longer understood his rights, that they did not apply to his conversation with Detective Nicholson, or that he was coerced in any way.  On October 3, 2013, Defendant was properly advised of his Miranda rights, indicated that he understood them, and voluntarily waived his rights, acknowledging in writing that his rights were given and he understood them.  Detective Nicholson observed SA Whiteman's administration of the Miranda warnings, she witnessed Defendant sign the Waiver Form, and she was present throughout the interrogation. Defendant did not invoke his right to remain silent and he did not request a lawyer.

One day later, on October 4, 2013, when she met with Defendant at the Fulton County Jail, Detective Nicholson told him, "what we discussed last night was still in effect, that he could - - he did not have to talk to me if he didn't want to, and that he could tell me to leave at any time, and I would."  (Tr. 141:20-24; see also Tr. 151-152).  Defendant did not indicate that he did not want to talk to

Detective Nicholson or that he wanted her to leave.  That the Waiver Form states, "[i]f you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time," and that Defendant appears to have had previous encounters with law enforcement, also support that Defendant understood his rights, including that he had the right to remain silent, at the time Detective Nicholson questioned him.  Defendant does not argue, and it does not appear, that his statements were coerced, or that Detective Nicholson threatened or injured him during the interrogation.[26]  The Court finds that Defendant understood his <u>Miranda</u> rights, and he voluntarily waived his right to remain silent by making statements to Detective Nicholson.

---

[26] To the extent Defendant implies that he was confused because he had been transferred to another facility and Detective Nicholson did not know whether Defendant had slept, eaten or showered since the night before, Detective Nicholson testified that Daniels "looked fine.  There was nothing to make [her] think that he was distressed or anything along those lines."  (Tr. 148:19-22).  Defendant also does not provide any support for his assertion that "any purported renewed waiver was involuntary in light of the context of the encounter—Detective Nicholson essentially telling Mr. Daniels that he may have a potentially fatal disease."  (Objs. [66] at 16).  Defendant's reaction—dropping his head, rubbing his forehead, and immediate admission of sexual relations with D.G.—supports that he was concerned for his health, but it does not indicate that he was unable to "make[] an independent and informed choice of his own free will."  <u>See</u> <u>Singleton v. Thigpen</u>, 847 F.2d 668, 670 (11th Cir. 1988), <u>cert. denied</u>, 488 U.S. 1019 (1989) (A statement is voluntary if "the defendant makes an independent and informed choice of his own free will.").

After a *de novo* review, the Court finds that Defendant knowingly and voluntarily waived his <u>Miranda</u> rights when he made statements to Detective Nicholson on October 4, 2013.  Defendant's statements to Detective Nicholson were not made in violation of Defendant's rights under the Fifth Amendment, and Daniels's objection is overruled.

  D. <u>Evidence Seized During Transfer from State to Federal Custody</u>

Defendant does not object to the Magistrate Judge's conclusion that the five pieces of paper seized from Defendant during his transfer from state to federal custody should be suppressed as exceeding the scope of a proper inventory search. (Objs. [66] at 17-20).  Defendant objects, however, to the Magistrate Judge's finding that SA Whiteman was authorized to conduct an inventory search of personal property in his possession when he was transferred.

It is well-settled that "a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment."  <u>Robinson</u>, 414 U.S. at 224.  The search of an arrestee incident a lawful arrest "enable[] officers to safeguard evidence, and, most critically, to ensure their safety during the 'extended exposure which follows the taking of a suspect into custody.'"  <u>Moore</u>, 553 U.S. at 178 (quoting <u>Robinson</u> at 234-235).  "[I]nventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of

lost, stolen, or vandalized property, and to guard the police from danger." Bertine, 479 U.S. at 372 (1987).  The Supreme Court has held that "it is not 'unreasonable' for police, as part of a routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." Illinois v. Lafayette, 462 U.S. 640, 648 (1983).

Here, SA Whiteman testified that he conducted the inventory of the items in Defendant's possession pursuant to an FBI policy which requires that "personal property removed from a person who has been arrested and is to be incarcerated should be carefully inventoried and promptly, thoroughly searched by Agents prior to being stored for safekeeping." (Gov't Ex. 5; Tr. 185-188).  To the extent Defendant argues that on December 18, 2013, he was not "arrested" for purposes of the FBI policy, Defendant had been indicted on federal charges by a federal grand jury and SA Whiteman was executing a federal warrant for Defendant's arrest.  That Defendant was already in *state* custody on other charges—albeit related to the same event—does not, as Defendant argues, transform his December 18, 2013, arrest on federal charges into a mere "administrative[] transfer[]." (Objs. [66] at 18).  SA Whiteman was authorized to conduct an inventory search of items in Defendant's possession when he arrested him and transferred him from state to federal custody, and Defendant's objection is overruled.

The Magistrate Judge found that SA Whiteman's close examination and seizure of the five pieces of paper as "evidence" exceeded the scope of a proper inventory search. The Magistrate Judge noted that SA Whiteman examined the content of the pieces of paper in sufficient depth to determine that they contained names, nicknames, addresses, and telephone numbers of individuals whom he thought, based on his investigation, were victims or witnesses in this case. The Court agrees with the Magistrate Judge's conclusion that SA Whiteman's close examination was investigatory in nature and the seizure of the pieces of paper— which were not obvious contraband—as evidence exceeded the permissible scope of an inventory search and FBI policy. See Khoury, 901 F.2d at 959-960. Defendant's Motion to Suppress Evidence Seized During Transfer is granted. The five pieces of paper seized from Defendant when he was transferred from state to federal custody are suppressed.

## V.    CONCLUSION

Having conducted a *de novo* review of the arguments in Defendant's Motions and Objections, and the parties' post-hearing briefs, and relying on the Court's independent determination of the facts based on the evidence and testimony presented at the evidentiary hearing, the Court finds that Defendant's October 3, 2013, arrest and the impound and inventory search of his vehicle did

not violate his Fourth Amendment rights.  The Court also finds that, under the

inevitable discovery exception, evidence seized from Defendant's person prior to

his arrest is not required to be suppressed.  The Court finds further that

Defendant's statements on October 3 and 4, 2013, were voluntary and not made in

violation of his Fifth Amendment rights.  The Court finds that the seizure of five

pieces of paper from among Defendant's personal property during his transfer from

state to federal custody exceeded the scope of an inventory search and that

evidence is suppressed.

 Accordingly, and for the foregoing reasons,

 **IT IS HEREBY ORDERED** that Defendant Cole Jamal Daniels's

Objections [62, 66] are **SUSTAINED IN PART** and **OVERRULED IN PART.**

Magistrate Judge E. Clayton Scofield, III's Reports and Recommendations [60, 64]

are **ADOPTED AS MODIFIED** by this Order.[27]

 **IT IS FURTHER ORDERED** that Defendant's Motion to Suppress

Statements [23] is **DENIED.**

---

[27]  The Court does not adopt the Magistrate Judge's findings of fact.  The Court
also rejects the portion of the October 24th R&R finding that Officer Bak's search
was justified as a search incident to arrest.

**IT IS FURTHER ORDERED** that Motion to Suppress Evidence [24] derived from his arrest and the seizure of his vehicle is **DENIED.**

**IT IS FURTHER ORDERED** that Motion to Suppress Evidence Seized During Transfer [28] is **GRANTED** with respect to the five pieces of paper seized from Defendant but **DENIED** with respect to the other property.

**SO ORDERED** this 9th day of February, 2015.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE